In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-4318, 99-4319, 99-4320, 99-4345

William Bracy and Roger Collins,

Petitioners-Appellants, Cross-Appellees,

v.

James Schomig and Roger Cowan,

Respondents-Appellees, Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
Nos. 93 C 5282, 93 C 5328--William T. Hart,
Judge.

Argued January 25, 2001--Decided April 18,
2001

Before Posner, Manion, and Rovner, Circuit
Judges.

Posner, Circuit Judge.  Bracy and Collins
were convicted in 1981 by a jury in an
Illinois state court of three gangster-
style murders committed the previous
year, and they were sentenced to death
upon the jury's recommendation, which
under Illinois law bound the judge. After
exhausting their state remedies, see
People v. Collins, 478 N.E.2d 267 (Ill.
1985), 606 N.E.2d 1137 (Ill. 1992), they
sought federal habeas corpus, which was
denied; and we affirmed the denial in
Bracy v. Gramley, 81 F.3d 684 (7th Cir.
1996). (The facts relating to the crimes,
which are not germane to this appeal, are
summarized in that opinion.) The Supreme
Court reversed, 520 U.S. 899 (1997),
holding that Bracy had made a sufficient
showing under Rule 6(a) of the Rules
Governing Section 2254 Cases in the
United States District Courts to entitle
him to conduct discovery concerning his
claim that the judge who had presided at
the petitioners' trial, Thomas Maloney,
had been biased. The Court remanded

Collins's case for reconsideration in light of its opinion in Bracy's case. Collins v. Welborn, 520 U.S. 1272 (1997) (per curiam). The cases were again consolidated in the district court, which after the discovery ordered by the Supreme Court issued an opinion denying the two petitioners a new trial on the issue of guilt but holding that they were entitled to a new sentencing hearing. United States ex rel. Collins v. Welborn, 79 F. Supp. 2d 898 (N.D. Ill. 1999). The parties have cross-appealed.

Judge Maloney was convicted in a federal court in 1993 of various offenses relating to his having taken bribes from criminal defendants during a period that included the year of the petitioners' trial. See United States v. Maloney, 71 F.3d 645 (7th Cir. 1995). He had not solicited or received bribes from these petitioners, but they argue that he habitually came down harder on defendants who had not bribed him than he would have done had he not been taking bribes. He did this, they argue, both to deflect any suspicion that might arise, in the cases in which he had accepted bribes and as a result acquitted or gone easy on the defendants, that he was "soft" on criminals (which might endanger his reelection), and to increase the size and frequency of the bribes offered him. The Supreme Court held that, "if it could be proved, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." 520 U.S. at 905 (emphasis added). In concluding that Bracy had presented enough evidence of such bias to entitle him to seek additional evidence through discovery, the Court focused on the contention that Bracy's trial counsel, Robert McDonnell, who had been appointed by Maloney to represent Bracy, had practiced law with Maloney before the latter had become a judge, and that McDonnell "might have been appointed with the understanding that he would not object to, or interfere with, a prompt trial, so that petitioner's case could be tried before, and camouflage the bribe negotiations in," a contemporaneous case before Maloney. Id. at 908. The Court pointed out that "this is, of course, only a theory at this point; it is not supported by any solid evidence of petitioner's trial lawyer's participation

in any such plan." Id. But if substantiated, this theory that Bracy's "trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged . . . cases might attract," id. at 909, would support "his claim that Maloney was actually biased in petitioner's own case." Id. (emphasis in original). The Court rejected the view of the judge who had dissented in our court that "petitioner was entitled to relief whether or not he could prove that Maloney's corruption had any impact on his trial. The latter conclusion, of course, would render irrelevant the discovery-related question presented in this case." Id. at 903 n. 4 (citation omitted). Regarding "the correctness of the various discretionary rulings cited by petitioner as evidence of Maloney's bias," the Court remarked that "many of these rulings have been twice upheld, and that petitioner's convictions and sentence have been twice affirmed, by the Illinois Supreme Court." Id. at 906 n. 6.

Twice the Supreme Court said that compensatory bias must, to provide a basis for relief for Bracy (and hence for Collins), be shown "in petitioner's own case." This means that even if Maloney engaged in compensatory bias in some cases, this would not be enough to justify a conclusion that the petitioners had been convicted and sentenced in violation of the due process clause; the petitioners would have to prove that Maloney had been biased ("actually biased," as the Court said) at their trial. A further straw in the wind is the Court's approving reference to our description of the theory of compensatory bias as "speculative": "The Court of Appeals, in its opinion, pointed out that this theory is quite speculative; after all, it might be equally likely that a judge who was 'on the take' in some criminal cases would be careful to at least appear to favor all criminal defendants, so as to avoid apparently wild and unexplainable swings in decisions and judicial philosophy." Id. at 906, citing 81 F.3d at 689-90.

Sometimes the temptation to bias is so great that proof of bias is not required.

This is true when the judge has a substantial pecuniary stake in the outcome of the case or when he is bribed by one of the parties. See, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986); Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1370-80 (7th Cir. 1994) (en banc); Cartalino v. Washington, 122 F.3d 8, 11 (7th Cir. 1997). Given the difficulty of peering into a judge's mind, in the absence of confession a high probability of bias is the most that can ever be proved and sometimes the objective circumstances alone are enough to establish the requisite probability. But it is apparent from the passages that we have quoted from the Bracy opinion that the Supreme Court does not regard the temptation to engage in compensatory bias as falling into the per se category, where proof of the temptation is enough to entitle a defendant to a new trial because the likelihood that the judge succumbed (perhaps quite unconsciously) is great. If it did fall into the per se category, as our dissenting colleague had argued it should, there would have been no occasion to conduct discovery, since the existence of the temptation was conceded and the only question was whether Maloney had yielded to it, either generally or in Bracy and Collins's case. The Court obviously thought it important to inquire whether Judge Maloney had succumbed. Later we decided a case, Cartalino, in which the requisite proof was supplied: the bribery scheme included convicting Cartalino. There is no evidence that Maloney's bribery scheme involved convicting Bracy and Collins. It is not irrelevant to note that if the possibility of compensatory bias is alone enough to establish actual bias, all decisions by a judge who accepts bribes would be invalidated--in the case of Judge Maloney, literally thousands.

The evidence establishing the existence of compensatory bias in a particular case need not be case specific. Had Maloney, who was deposed as part of the discovery conducted on remand, testified that he had practiced compensatory bias in all the cases in which he had not been bribed, and his testimony had been believed, it would be irrelevant that there was no evidence about the motive for his rulings in the trial of these petitioners, or even that he had no

recollection of that trial. All that would have to be established, all that had to be established in the remand proceedings, was a factual basis for inferring that Maloney probably did harbor an actual bias against the defendant. That could not be inferred from the fact that Maloney took bribes, or even, as we have noted, from the fact, if it was a fact, that he practiced compensatory bias, for he may not have done so in every case. We do not know whether he practiced it in any case; and he would have been unlikely to practice it in every case. If he thought that a defendant was certain to be convicted and receive a severe sentence, he would have no incentive to lean in favor of the prosecution and by doing so jeopardize the conviction or sentence by making it more vulnerable to reversal on appeal.

But we must consider more closely the findings of the district judge on remand and the evidence on which they are based. To begin with, the judge found that McDonnell had never practiced law with Maloney and had pulled no punches in his defense of Bracy. This finding is not clearly erroneous, and so it binds us and wipes out the theory of bias that was the focus of the Supreme Court's discussion of the need for discovery.

The district judge noted that during his allocution before being sentenced, Maloney had spoken of the convictions and sentences of Bracy and Collins as "a credit to his record as a judge and evidence that he was not corrupt." 79 F. Supp. 2d at 907. This led up to the judge's last and critical finding in the part of his opinion captioned "findings of fact," which was that (id. at 908)

during the same time petitioners' case was pending, other cases were pending in which Maloney took bribes, particularly the close in time Chow and Rosario cases. Before and after this time, Maloney was engaged in a pattern of receiving money. Based on the evidence in the record, it is a possible and reasonable inference in this case that Thomas Maloney was motivated, at least in part, to maintain a prosecution-oriented attitude and to make pro-prosecution rulings by a desire to deflect suspicion from cases in which he accepted bribes. Other documented instances of Maloney so acting to deflect

suspicion from his corrupt conduct are reported in the Hawkins and Titone cases.

This finding has no factual support; it is merely conjecture. It was natural for Maloney, at his sentencing for accepting bribes from criminal defendants, including defendants in murder cases, to point to a case before him in which the murderers had been convicted and sentenced to death, though the jury, not he, had convicted them and had made a recommendation for death that bound him. It does not follow that when he presided at the defendants' trial he was thinking of how their convictions and sentences might stave off future accusations of bribe taking, or even how they might dispel suspicions of it if he was even aware at that time, early in his bribe-taking career, that there were any suspicions--probably he was not, or he would not have continued taking bribes for nine more years. The two cases to which the district judge referred as examples of Maloney's "acting to deflect suspicion from his corrupt conduct" are cases in which Maloney accepted bribes, but in one he returned the bribe because he realized that he was under investigation and in the other he convicted the defendant anyway. Neither case had anything to do with compensatory bias.

The district judge seems to have based his conclusion about Maloney's motivation largely on the "Government's Official Version of the Offense" submitted in Maloney's criminal trial. This document, which the parties refer to as the sentencing recommendation or sentencing memorandum, is also the cornerstone of the petitioners' appeal. In it the Justice Department accused Maloney (whom it called "degenerate" and "a mafia factotum") of practicing compensatory bias. The document consists, however, of 57 single-spaced pages, and the allegation of compensatory bias appears on just one of them. It is colorful ("THOMAS MALONEY far surpassed the category of corrupt jurist to chart a new territory of defilement"), vivid, even plausible. But no substantiation or elaboration is offered. No cases in which Maloney may have engaged in compensatory bias are cited; no evidence, direct or circumstantial, admissible or inadmissible, that he ever engaged in the

practice is offered. The allegation is sheer conjecture. The Justice Department understandably was pressing for a very long sentence (more than 20 years), and it pulled out all the stops.

The district judge may have had misgivings about the theory of compensatory bias that he had just embraced, because in the section of his opinion captioned "conclusions of law" he made a finding (a finding of fact, not a conclusion of law) that "the evidence does not establish that an interest in covering up wrongdoing or motivating larger bribe payments pervaded every action taken by Maloney as a judge. Maloney's bribetaking has not been shown to have been so pervasive a part of his judicial practices that it can be assumed he was always, or even usually, motivated by his pecuniary and/or penal interests when exhibiting his prosecution-oriented tendencies." Id. at 909 (emphasis added). The judge then examined Maloney's rulings at the trial of Bracy and Collins to see whether this might have been one of those unusual cases and found no rulings at the guilt phase of the trial that were suggestive of bias. He concluded that the convictions were untainted. The conclusion is correct, and compelled by the evidence, which was even weaker than the judge thought. For all that appears, Maloney was a prosecution-minded judge for reasons unrelated to his taking bribes. That he would accept payment to acquit criminals does not imply any affection for criminal defendants or their lawyers such that he must have been acting against character when he ruled in favor of the prosecution in cases in which he was not bribed. That is a possibility, but no more than a possibility. Maloney's conduct was appalling, his character depraved, but the bridge to the trial of Bracy and Collins is missing. He was certainly capable of dreaming up and acting on compensatory bias, but there is no evidence that he did.

But examining Maloney's rulings at the sentencing phase of the petitioners' trial, the district judge found the taint of compensatory bias. The only ruling (or pair of rulings) he mentioned was Maloney's refusal to sever Collins's sentencing hearing from Bracy's and conduct it first in order to give Bracy's lawyer

more time to prepare for his client's hearing. The ruling is said to have harmed Collins because it meant that the jury would hear evidence about additional murders that Bracy had committed in Arizona, murders in which Collins had not been implicated. He had not raised the issue of severance in his state-court appeal, and as a result it was treated as forfeited in the federal habeas corpus proceeding. It is not surprising that he didn't raise the issue, because it is very difficult to see how he would have been harmed, rather than helped, by evidence that Bracy was a worse murderer than he. And so it is difficult to see how the ruling could be thought evidence of bias. More important, the ruling on the motion to sever was not new evidence obtained through discovery after the remand by the Supreme Court. That in itself would not disqualify the ruling as a basis for finding compensatory bias; but in fact the discovery brought nothing to light that made the inference of compensatory bias any more compelling than it had been before the discovery was conducted. Much of the discovery consisted of a wild goose chase after McDonnell's relationship to Maloney. The chase did uncover ugly evidence of criminality and mob ties of both McDonnell and Maloney, but nothing that bore on the issue of compensatory bias-- except to dispel the suspicion that Maloney had appointed McDonnell to make sure that Bracy would be convicted, or that McDonnell had tried to throw the case in order to curry favor with Maloney.

The petitioners note the district judge's failure to mention that their trial was a high-profile case sandwiched in between two cases in which Maloney had accepted bribes and that Maloney may have believed that if he gave the prosecutor what he wanted in this high-profile case, a case of particular importance to the Cook County state's attorney's office, the prosecutor would be less likely to act on any suspicion that he might have had of Maloney's bribetaking. These points do not nudge the possibility that Maloney was biased in the petitioners' case to a probability. After lengthy discovery the theory that Maloney practiced compensatory bias, either generally or in this case, remains hopelessly speculative. The petitioners

have failed to show that they were denied due process of law either at trial or in sentencing. To reverse their convictions or sentences would merely compound Maloney's wrongdoing.

The denial of relief with respect to the petitioners' convictions is affirmed. The grant of such relief with respect to their sentences is reversed with instructions to enter judgment for the respondents.

ROVNER, Circuit Judge, dissenting. Five years ago, I argued that Bracy and Collins ought to be given the chance to conduct discovery in an effort to marshal evidence that Judge Maloney's serial bribe-taking had an impact on their trial. "If their discovery proves fruitless," I said, "we can at least take comfort in the knowledge that we have given them every opportunity to prove that Maloney's corruption deprived them of a fair trial." Bracy v. Gramley, 81 F.3d 684, 699 (7th Cir. 1996) (dissent), rev'd in part, 520 U.S. 899, 117 S. Ct. 1793 (1997). The petitioners have now had their chance at discovery. If proof that a corrupt judge is biased in cases where no bribe is tendered were easy to come by, the petitioners would no doubt have found it. But smoking guns are rare, and I agree with my colleagues that discovery has yielded no hard proof that Maloney engaged in camouflaging bias in their particular case. What discovery has produced, however, should make us feel less, rather than more, confident that the petitioners' convictions and sentences were untainted by Maloney's bribe-taking.

We know, of course, as we did before, that Maloney was engaged in serial bribe-taking within the time frame surrounding the petitioners' convictions. The jury's finding against Maloney reveals that he accepted bribes to fix at least four cases: People v. Lenny Chow, No. 81 C 4020, People v. Ronald Roby, No. 82 I 50244, People v. Owen Jones, No. 81 C 9832, and People v. Earl Hawkins & Nathson Fields, No. 85 C 6555. The prosecution's case against Maloney posited that he accepted bribes in at least two other cases--People v. Frank

Calistro, No. 82 C 8355, and People v. Wilfred Rosario, No. 79 C 2469--although the jury did not find the alleged bribe in Calistro to have been proved beyond a reasonable doubt and it was not asked to render a finding as to the alleged bribe in Rosario. Hearsay evidence in the government's investigative file on Maloney suggests that he may also have accepted a bribe to acquit the defendant of murder in People v. Rocco LaMantia, No. 79 C 2623, in 1981. R. 162 Ex. 23 at 6, Ex. 24 at 1-2; see Collins v. Welborn, 79 F. Supp. 2d 898, 904 para. 19 (N.D. Ill. 1999).

The record now before the court also makes it both possible and reasonable to infer that Maloney accepted bribes in many other cases. An FBI analysis of Maloney's finances reveals that his expenditures in the years 1978 to 1984exceeded his known, legitimate income in those years by some $400,000. R. 162 Exs. 53, 54; 79 F. Supp. 2d at 907 para. 40.  Assuming that the typical bribe was in the $5,000 to $10,000 range, then Maloney may have fixed at least 40 cases, and perhaps as many as 80 during those years./1

Five of the identified acts of bribery took place between 1981 and 1983, and one in 1986. (Bracy and Collins, of course, were arraigned in March of 1981, and they were tried, convicted, and sentenced to death in July 1981.) Two of the known bribes were tendered to Maloney in proceedings that took place shortly before and shortly after Bracy and Collins were tried in July 1981: after accepting a bribe of $2,500 in People v. Rosario, Maloney suppressed the defendant's confession on January 23, 1981, and dismissed the case on June 17, 1981; and in mid-August, 1981, after accepting an unknown share in a bribe of $100,000, Maloney acquitted all three defendants in People v. Chow, 79 F. Supp. 2d at 903-04 para.para. 12, 16. In short, we know that Maloney's bribe-taking was neither isolated nor sporadic, and that Bracy and Collins were tried in the midst of it.
 The record also supplies some confirmation that Maloney engaged in acts designed to further and/or camouflage his bribe-taking. First, now part of the record in this case is the transcript of Maloney's trial (which previously was

under seal and unavailable to the petitioners). That transcript includes the testimony of William Swano, recounted in my previous dissent. See 81 F.3d at 697. In short, Swano, who had bribed Maloney in other cases, had a case before Maloney--People v. James Davis--that he believed to be a sure winner for his client. On Swano's advice, his client waived his right to a jury and the case was tried to Maloney, whom Swano did not think it necessary to bribe in view of the merits of the case. Maloney nonetheless convicted Swano's client, which Swano construed as a lesson that "to practice in front of Judge Maloney . . . we had to pay." R. 162 Ex. 20, United States v. Maloney & McGee, No. 91 CR 477, Trial Tr. at 2530. Without more, one might say that this was nothing more than Swano's belief, and that it is entirely possible that Maloney convicted Davis wholly on the merits of the prosecution's case. But Swano subsequently met with bagman Robert McGee to discuss a bribe in Hawkins & Fields. McGee told Swano that Maloney had okayed the discussion, acknowledging that he had "screwed" Swano in the Davis case. R. 241, United States v. Maloney & McGee, No. 91 CR 477, Trial. Tr. at 2568. That acknowledgment constitutes confirmation that Maloney did engage in camouflaging bias.

Second, Maloney initially accepted a $10,000 bribe in People v. Hawkins & Fields, only to return the money and convict the defendants when he perceived (correctly) that the FBI had its eye on him. The Illinois Supreme Court subsequently concluded that Hawkins and Fields were entitled to a new trial, because Maloney had been motivated toconvict them in order to deflect suspicion. People v. Hawkins, 690 N.E.2d 999, 1004 (Ill. 1998).

Third, in People v. Dino Titone, No. 83 C 127, Maloney accepted a $10,000 bribe to acquit Titone, but convicted him anyway, again to deflect suspicion. That compensatory motive persuaded the post-conviction judge to vacate the defendant's conviction and grant him a new trial. R. 239, People v. Titone, No. 83 C 127, Post-conviction Tr. at 10-13 (Cir. Ct. Cook County July 25, 1997).

Fourth, we have the version of the offense that the government submitted to

the court for purposes of Maloney's sentencing, which wholly embraces and advocates the notion that Maloney engaged in compensatory bias.

. . . THOMAS MALONEY'S corruption began at the time he was a criminal defense attorney paying off judges and court personnel to fix cases--including a notorious murder case--and continued through the time he was a judge working as a mafia factotum in the Cook County Circuit Court system and taking all manners of bribes on very serious criminal cases. Thomas Maloney's reputation as a strict prosecution-oriented judge was not a mistake. By casting this image, Maloney sought to deflect suspicion from his criminal activity, while simultaneously giving select desperate defendants who knew the right people an incentive to pay him off. Thus, by using his position as a felony trial court judge to extract bribes from defendants who face[d] long periods of imprisonment or execution, THOMAS MALONEY far surpassed the category of corrupt jurist to chart a new territory of defilement.

*   *   *

. . . [W]hen he got his turn on the bench, THOMAS MALONEY imposed a sinister system which had the dual effect of concealing and promoting his corruption. THOMAS MALONEY the former champion of the defendant became one of the most ruthless judges on the bench. Showing defendants little mercy had the effect of diverting any conceivable suspicion from MALONEY while at the same time giving defendants a strong motivation to cough up big bribery dollars.

R. 162 Ex. 1, United States v. Maloney & McGee, No. 91 CR 477, Government's Official Version of the Offense at 54-55 (N.D. Ill. filed May 23, 1994). As my colleagues suggest, the government certainly had an incentive in submitting this memorandum to portray Maloney in the worst possible light and so to persuade Judge Leinenweber, who sentenced Maloney, to mete out the harshest possible penalty. Yet, the government obviously had no interest in helping Bracy, Collins, or any other defendant convicted by Maloney to obtain relief from their convictions. It strikes me as doubtful

that any prosecutor--federal or state-- would admit that a judge deliberately favored the prosecution for nefarious reasons if the facts did not warrant that acknowledgment. Having investigated and tried Maloney, his prosecutors were in the best position to assess his modus operandi as a corrupt jurist and its ramifications for defendants who did not bribe him. Their considered judgment, as officers of the court, that Maloney did engage in purposeful and systematic compensatory bias deserves much more weight than my colleagues (ensconced as we all are within the sheltered environs of this court) are willing to give it.

We know one more fact. In 1994, Maloney stood before Judge Leinenweber defiantly proclaiming his innocence. By this time, of course, the proof of Maloney's bribe- taking had already convinced a jury beyond a reasonable doubt that he was a criminal. Nonetheless, as he waited for Judge Leinenweber to pass sentence, Maloney continued to insist that he had been an honest judge with a distinguished career. Among the cases he cited as a credit to his career, and as proof that he was not corrupt--in addition to Hawkins & Fields, where we know that Maloney engaged in compensatory bias-- were the convictions of Bracy and Collins. R. 162 Ex. 13, United States v. Maloney & McGee, No. 91 CR 477, Sentencing Tr. at 606-07 (N.D. Ill. July 21, 1994).

In sum, the record supplies us with confirmation that Maloney was engaged in serial bribe-taking that almost certainly was more extensive than the particular bribes underlying his conviction reveal; that he accepted bribes in cases immediately before and after Bracy and Collins were tried; that he was cognizant of the public scrutiny that his bribe- taking could engender and did not hesitate to take compensatory action-- including the return of a bribe, and the conviction of an individual who had bribed him--in order to protect himself; and that the very government that built the case against Maloney believed that he cultivated a reputation as a fierce, law- and-order judge both to deflect suspicion from his bribe-taking and to encourage defendants to bribe him.

What we do not have, and what my

colleagues insist is a prerequisite to relief, is hard proof that camouflaging bias was at work in this case. The theory that Bracy floated before the Supreme Court--that Robert McDonnell was Maloney's former law partner, and that Maloney agreed to appoint him as Bracy's counsel in exchange for a promise that he would accept a quick trial, so that the trial of Bracy and Collins might serve to camouflage the corrupt disposition of the Chow murder prosecution, see 520 U.S. at 907-08, 117 S. Ct. at 1798-99--was not borne out by the facts./2 Maloney, who continues to deny that he ever accepted a bribe, of course will not admit that he ever engaged in camouflaging bias in any case, let alone this particular one. And although there is proof that Maloney may have taken compensatory action in other cases to conceal and further his bribe-taking franchise, there is no proof that he invarably engaged in camouflaging bias in cases where no bribe was tendered.

Proof along these lines could come from only two sources--Maloney, and those who associated with him in his bribe-taking. Maloney is the only individual who would necessarily know when he took compensatory actions to hide his bribe-taking, but the questioning of him quickly reached a dead end. Maloney continues to "vehemently and arrogantly den[y] all of the bribery charges clearly established by the jury findings and the evidence presented at his criminal trial." 79 F. Supp. 2d at 907 para. 41. Those who bribed Maloney or who facilitated his bribe-taking--people like Swano, who learned firsthand the need to bribe Maloney in order to obtain an acquittal, and Lucius Robinson, who served as both bailiff and bagman for Maloney--might have a glimpse into Maloney's mind. But in the finest tradition of mobsters, swindlers, and certain campaign fund-raisers, Swano declined the opportunity to further incriminate himself, R. 213 Ex. 14, Deposition of William Swano, and Robinson had nothing more insightful to say than Maloney was known as "a hard fucking judge" who "more or less leaned toward [prosecutors and police officers] in cases," R. 213 Ex. 10(b), Deposition of Lucius Robinson, at 47, 48./3

But the lack of such proof by no means rules out the possibility that Maloney

did engage in camouflaging bias on a regular basis, and possibly in this case. Bribery itself is quite difficult to expose. The fact that an acquittal (or some other dispositive ruling for the defendant) has been paid for is rarely evident from the record. Individual judges often take widely disparate views of the facts and even the law, and legitimately so. Given the breadth of a judge's discretion, and his nearly unfettered power to render credibility assessments, one can almost never say with certainty that a surprising ruling in favor of the defendant is necessarily the product of corruption. To show that money has changed hands often requires years of work using the full array of investigative resources (electronic surveillance, undercover agents, and cooperating witnesses). Proof that a corrupt judge engaged in camouflaging bias will be at least as difficult to obtain, if not more so, and persons in the position of Bracy and Collins must search for that proof without the resources and might of the government. If a judge decides to hide his bribe-taking by favoring the prosecution in a particular case, there will be little to mark that decision. No money will change hands, the prosecutor will not be given a whispered assurance that "things have been taken care of," and there will be no one in the courtroom (save the judge) patiently awaiting a foreordained result. Absent a lopsided record, the only hard proof of compensatory bias can issue from the judge's own mouth. Where, as here, the judge does not even acknowledge his own bribe-taking, and associates who may have been privy to his thinking plead either ignorance or the Fifth Amendment, then the proof is wholly inaccessible.

Yet, proof of actual bias has never been treated as the sine qua non of a due process claim. The Supreme Court has not hesitated to vacate a conviction where it is shown that the judge who presided at trial had an interest in the outcome, even if there is no proof that this interest manifested in actual bias against either party. Thus, in Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437 (1927), the Court invalidated a statutory scheme that authorized town mayors to try persons accused of liquor offenses and provided for reimbursement of the mayors' trial costs from the fines imposed on

those they convicted of such offenses. Because the scheme in this way gave the mayor-judge a pecuniary interest, albeit a relatively modest one, in the outcome of the trial, the court reasoned, it was inconsistent with due process.

There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of prejudice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

273 U.S. at 532, 47 S. Ct. at 444 (emphasis supplied). Similarly, the Court in In re Murchison, 349 U.S. 133, 75 S. Ct. 623 (1955), concluded that due process would not permit the same judge who acted as a one-person grand jury under Michigan law to try contempt charges arising out of the grand jury proceedings. "Fairness of course requires an absence of actual bias in the trial of cases," the Court observed. Id. at 136, 75 S. Ct. at 625. "But our system of law has always endeavored to prevent even the probability of unfairness." Ibid. (emphasis supplied). And in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S. Ct. 1580 (1986), the Court found that a due process violation occurred where a member of the Alabama Supreme Court had cast the deciding vote and written the decision affirming a $3.5million punitive damage award against an insurance company for its bad-faith refusal to pay a valid claim at the same time that the justice had at least one similar lawsuit of his own pending against an insurer in a lower Alabama court. That pending action, the Court reasoned, gave the justice a pecuniary interest in the outcome of the decision that he authored. Id. at 824-25, 106 S. Ct. at 1586-87. The Court did not find it necessary to decide whether the justice was actually biased by virtue of his own litigation; the possibility that he might have been so was sufficient to establish

a due process violation. Id. at 825, 106 S. Ct. at 1587.

The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"

Ibid., quoting Murchison, 349 U.S. at 136, 75 S. Ct. at 625 (additional citation omitted).

The circumstances here likewise argue in favor of treating the judge's temptation to lean in one party's favor as disqualifying in and of itself. Common sense tells us that a corrupt judge who wishes to retain his office will do whatever he can to hide his bribe-taking. An obvious way to do that is to make it a practice to favor the State in cases where no bribe is tendered./4 There is an inherent difficulty in the attempt to peer into a judge's mind to ascertain if, when, and how the judge engaged in compensatory actions to deflect suspicion away from his wrongdoing. But the possible temptation to cloak his bribe-taking in this way was present nonetheless. And the presence of that temptation in turn undermines confidence in the fairness of the trials over which the corrupt judge presided.

My colleagues suggest that the Supreme Court has already rejected the notion that a corrupt judge's temptation to engage in compensatory bias is sufficient to place the case within the Tumey-Murchison-Aetna framework, but instead has conditioned relief on proof of actual bias. Ante at 4-5. It is true that the Court remanded this case so that the petitioners would have the chance to conduct discovery aimed at showing actual bias. It is also true that the Court acknowledged, in a footnote, that discovery would be unnecessary if proof of actual bias were not required. 520 U.S. at 905 n.5, 117 S. Ct. at 1797 n.5. But I think it wrong to suggest that the Court, by implication, has already decided that proof of actual bias must be shown on the part of a corrupt judge. The Court granted certiorari to decide one and only one question--whether the petitioners were entitled to discovery.

Bracy v. Gramley, 519 U.S. 1074, 117 S. Ct. 726 (1997). Had the discovery yielded proof that Judge Maloney was actually biased against Bracy and Collins, then there would be no need to consider whether his bribe-taking might entitle them to relief even in the absence of that proof. It may be that when confronted with the question of whether actual bias must be shown, the Supreme Court will decide the issue as my colleagues have predicted. But we have no business attributing a holding to the Court on a question as to which it did not grant certiorari, it did not give the parties an opportunity to brief, and which was not the subject of argument. The Supreme Court does not make law by stealth. When it decides the issue, we will know it.

We have a duty at this juncture to consider not only whether Bracy and Collins have succeeded in proving actual bias, but also whether, in light of what their discovery has (and has not) produced, the burden we have assigned to them is a realistic and appropriate one. Discovery, after all, has not proven that Maloney was in fact fair to any defendant who did not bribe him. It has simply failed to produce proof that he was actually biased against Bracy and Collins. It has, however, established that Maloney's bribe-taking was not isolated, that he was sensitive to public detection of his bribe-taking, that on occasion he took compensatory actions in order to hide and further his bribe-taking, and that the successful prosecution of Bracy and Collins was a case that he could and did cite as proof that he was not corrupt. At the same time, the limits of discovery have been laid bare: the principal wrongdoer refused to acknowledge even taking a bribe, and others who might have provided some insight into his practices either claimed an inability to do so or refused to speak at all. There remains the very real possibility that Maloney might have engaged in compensatory bias against the petitioners, but without the glimpse into his mind that my colleagues agree would be difficult to obtain, ante at 4, we will never know it.

And so we return to the fundamental problem that I highlighted in my first dissent. My colleagues believe that in

the absence of any proof establishing the taint of compensatory bias in this particular case, we should assume that Maloney gave Bracy and Collins a fair trial. I remain puzzled as to the justification for this. After all, as the Supreme Court has recognized, the presumption that Maloney properly discharged his duties as a judge "has been soundly rebutted[.]" 520 U.S. at 909, 117 S. Ct. at 1799. Moreover, in contrast to the Tumey-Murchison-Aetna line of cases, we are not simply dealing here with a conflicted judge, but a corrupt one. Common sense suggests that the corrupt judge would be even more likely to yield to the temptation not to "hold the balance nice, clear, and true between the state and the accused," Tumey, 273 U.S. at 532, 47 S. Ct. at 444, than an honest one. Yet the court clings to the idea that Maloney's bribe-taking was insular, and that he rendered acceptably fair trials when he did not take bribes. I doubt that my colleagues would be so complacent if they stood in the petitioners' shoes. If a court system promised everyone a fair trial, but offered to stack the deck in a party's favor for an appropriate fee, the cash machines and loan sharks nearest to the courthouse would be swamped with business, and not simply because everyone would want the favors that the fee might secure for them, but because no one could be confident in the fairness of supposedly impartial proceedings that others were buying their way out of. No one convicted by or before Maloney can feel sanguine, knowing that for as little as $2,500 he might have walked out of his courtroom a free person. And none can be sure that, in the absence of a bribe, Maloney did not take the opportunity to hide and/or promote his bribe-taking.

The driving factor behind the court's presumption that Maloney was impartial when not bribed is the same one that has lurked in the background since the start of this case--our reluctance to set a precedent that might undo the convictions of all those persons who were tried and convicted before Maloney. See ante at 5. "To reverse [the petitioners'] convictions or sentences would merely compound Maloney's wrongdoing," my colleagues observe. Ante at 10. That view, however, underestimates the profound damage that a corrupt judge

inflicts by shaking the public faith in the fairness of our judicial process. Ignoring the impact that a judge's systematic acceptance of bribes has upon cases in which no bribe was tendered will simply magnify the distrust that results from official corruption. The truth is, given the passage of time, most people tried and sentenced by Maloney have served their prison terms, so few people would go free were retrials ordered for defendants like Bracy and Collins. But confidence in the integrity of the judicial system would be promoted. And in a State in which bribery has by no means vanished, requiring such retrials might encourage the State and its citizens to scrutinize the conduct of our public officials with a keener eye.

It strikes me that the court's disposition of this case is laden with irony. Defendants tried before judges of unquestioned integrity, with a possible temptation to favor the government, are entitled to new trials. Tumey, 273 U.S. 510, 47 S. Ct. 437. Defendants who bribed Maloney, only to be convicted by him when he decided that fixing their cases was too risky, have won new trials. Hawkins, 690 N.E.2d 999. Even defendants who managed to initially escape conviction by successfully bribing Maloney are being given exactly what Bracy and Collins seek today--a fair trial before an honest and impartial judge. People v. Aleman, 1994 WL 684499 (Cir. Ct. Cook County Oct. 12, 1994), aff'd, 667 N.E.2d 615 (Ill. App. 1996), cert. denied, 519 U.S. 1128, 117 S. Ct. 986 (1997); see also Aleman v. Honorable Judges of Circuit Court of Cook County, 138 F.3d 302 (7th Cir.), cert. denied, 525 U.S. 868, 119 S. Ct. 162 (1998). But these two petitioners, sentenced to death before a judge whose career as an attorney and judge was corrupt from beginning to end, are told that the judgment of a racketeer is perfectly satisfactory. It is a sad day indeed when defendants who attempted to purchase their way out of a conviction receive a greater measure of justice than those who did not.

I respectfully dissent.


/1 The known bribes amounted to less than $5,000 in several instances and in some cases $10,000 or more. The greatest known bribe tendered to Maloney was an undisclosed share of the $100,000 pay-

off in Chow for the acquittal of three gang members in a notorious shooting in Chicago's Chinatown. The other known bribes include the tender of $10,000 in Hawkins & Fields to acquit one or both of two El Rukn gang members of a double murder (a bribe that Maloney subsequently returned when he suspected that the FBI was monitoring the case), the $2,300 Maloney accepted in Roby in exchange for a sentence of probation, the $4,000 to $5,000 Maloney accepted to acquit the defendant in Jones of felony murder and sentence him to a term of nine years on the lesser charge of voluntary manslaughter. The alleged bribes tendered in Calistro (for a sentence of probation) and Rosario (where the defendant's confession was suppressed and the case against him was eventually dismissed) were each in the amount of $2,500.

/2 I would note, however, that discovery has hardly given us reassurance as to McDonnell's credentials. It turns out that McDonnell was a twice-convicted felon who managed to regain his law license in 1980, the year before Bracy and Collins were tried. R. 213 Ex. 8, Deposition of Robert McDonnell, at 26-32; see United States v. Mirro & McDonnell, 435 F.2d 839 (7th Cir. 1970); In re McDonnell, 413 N.E.2d 375 (Ill. 1980). Coincidentally, McDonnell also had a reputation among his colleagues as a fixer of cases. R. 213, Ex. 11, Deposition of Terrence Hake, at 16. Years later, McDonnell would add yet another conviction to his curriculum vitae. See United States v. Taglia & McDonnell, 922 F.2d 413 (7th Cir.), cert. denied, 500 U.S. 927, 111 S. Ct. 2040 (1991).

/3 The only other readily apparent means of establishing actual compensatory bias--one that the state's counsel (who with commendable grace and patience endured my pointed questions) identified at oral argument--would be a pattern of rulings and conduct so overtly hostile to the defense that the judge's bias would be readily apparent from the record. That is obviously not the case here, or the petitioners' convictions would long ago have been vacated.

/4 My colleagues, of course, remain skeptical that a judge would engage in such compensatory bias. They have suggested that a corrupt judge might do better to cultivate a defense-friendly reputation, so that paid-for acquittals look less out of place. See ante at 4. That skepticism, however, ignores the possibility that the State might be less willing to consent to a bench trial before a defense-friendly judge, which in turn would make it more difficult for the judge to sell his services. It also overlooks the proof that Maloney did not hesitate to engage in compensatory bias on at least two occasions, when he

convicted defendants who had bribed him in order
to deflect the government's suspicions--notwith-
standing the incentive that his turnabout gave to
those defendants to blow the whistle on him. It
also overlooks Swano's testimony, which suggests
that Maloney engaged in compensatory bias not
simply to avoid suspicion, but to cultivate
additional bribes.