In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-4318, 99-4319, 99-4320 & 99-4345

WILLIAM BRACY and ROGER COLLINS,

Petitioners-Appellants, Cross-Appellees,

v.

JAMES SCHOMIG and ROGER COWAN,

Respondents-Appellees, Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 93 C 5282, 93 C 5328--William T. Hart, Judge.

Argued September 21, 2001--Decided March 29, 2002

   Before FLAUM, Chief Judge, and POSNER,
COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE,
ROVNER, DIANE P. WOOD, EVANS, and WILLIAMS,
Circuit Judges.

   EVANS, Circuit Judge.  A case combining
two men scheduled to die at the hands of
the State with the corrupt judge who
sentenced them creates a toxic mix. And
so it is with this case, which we resolve
today while sitting en banc.

   Thomas J. Maloney betrayed the position
of high public trust he held as an
elected circuit judge in Cook County,
Illinois. The perversion of his oath
forced Maloney to exchange his judge's
robe for the garb of a prisoner at
afederal correctional institution.
Although Maloney can no longer disgrace
the office he once held, this case
demonstrates that the ashes of his
corruption still smolder. We certainly
hope that few, if any, embers will remain
after today.

   There are two parts to today's decision,
and each commands a solid majority of the
court. The lineup of judges, however, is
different on each part. To help the
reader, we note that the part of the
judgment which rejects the claim that our
two petitioners are entitled to a full
new trial is joined by Chief Judge Flaum
and Circuit Judges Posner, Coffey,

Easterbrook, Manion, Kanne, and Evans. The part of the judgment holding that the defendants are entitled to receive a new hearing on whether the death penalty should be imposed--this time before an honest judge--is agreed to by Chief Judge Flaum and Circuit Judges Coffey, Ripple, Kanne, Rovner, Diane P. Wood, Evans, and Williams.

This case has a 20-year history, the first 13 in the Illinois state courts. We will not relate that extensive history here. What follows is only a brief summary.

William Bracy/1 and Roger Collins were convicted, after a jury trial, on multiple charges of murder, armed robbery, and aggravated kidnaping. Following a further, two-stage hearing before the same jury, both men were sentenced to death for their murder convictions, and to concurrent 60-year prison sentences on their other convictions. Bracy and Collins appealed, and the Illinois Supreme Court affirmed their convictions and sentences. People v. Collins, 106 Ill.2d 237, 478 N.E.2d 267 (1985). They then sought, and were denied, postconviction relief in the circuit court of Cook County, Illinois. The Illinois Supreme Court again affirmed, People v. Collins, 153 Ill.2d 130, 606 N.E.2d 1137 (1992).

Bracy and Collins then moved to federal court by filing separate habeas corpus petitions in the United States District Court for the Northern District of Illinois. Their petitions were consolidated, and in a 1994 decision the district court denied relief. United States ex rel. Collins v. Welborn, 868 F. Supp. 950 (N.D. Ill. 1994). The petitioners appealed and, in a 2-1 panel decision, we affirmed the district court. Bracy v. Gramley, 81 F.3d 684 (7th Cir. 1996). The United States Supreme Court reversed our decision on the question of whether Bracy was entitled to discovery, finding that he had shown good cause for moving forward with his claim for relief. Bracy v. Gramley, 520 U.S. 899, 117 S. Ct. 1793 (1997). The Court then returned Collins' case to us for reconsideration in light of the Bracy decision. Collins v. Welborn, 520 U.S. 1272, 117 S. Ct. 2450 (1997). We sent the cases to the district court, which eventually denied

habeas relief as to each petitioner's conviction but granted relief as to their sentencing. United States ex rel. Collins v. Welborn, 79 F. Supp. 2d 898 (N.D. Ill. 1999). We affirmed the district court as to the convictions but reversed on the sentencing issue, again in a 2-1 panel decision. Bracy v. Schomig, 248 F.3d 604 (7th Cir. 2001). Subsequently, that opinion was vacated when a majority of our judges voted to rehear the case en banc. Which brings us to today.

The events giving rise to this case occurred some 21 years ago when a drug deal turned deadly. Three men, expecting to buy drugs, were instead robbed and taken from a Chicago apartment to a viaduct at Roosevelt Road and Clark Street, where they were shot to death. Bracy, Collins, and Murray Hooper, who was tried separately, were charged with various crimes growing out of the episode.

The chief witness against Bracy and Collins was Morris Nellum, who admittedly took part in the crimes. Nellum testified that Collins asked him to drive Collins' Cadillac to Roosevelt Road and Clark Street because Collins wanted to be picked up there. Nellum then saw Collins, Bracy, and Hooper place three men in the back seat of an Oldsmobile; Collins drove away in that car. Bracy drove his own car and Nellum drove the Cadillac. When Nellum arrived at the viaduct, he heard shots. Immediately, he saw Bracy running to his automobile; he was carrying a sawed-off shotgun. Collins got into the car with Nellum. As they sped from the scene, Collins said, "That damn Hooper. I told him to wait until--I wanted to use the shotgun because they can't trace the shotgun, but he used the gun instead." Bracy gave Nellum $125 and told him to "Just be cool." Nellum then drove, again with Collins, to Lake Michigan, where Collins threw two handguns into the lake--a .38-caliber Charter Arms revolver and a .357 revolver. The Charter Arms revolver was identified by Christina Nowell, who testified that Bracy previously had the opportunity to take the revolver from her. She also said that Bracy later told her "he had murdered some people with [her gun] and threw it into the Chicago River." A gun, later discovered in the lake, was Nowell's gun. At trial, in addition to Nellum, the

State called a number of witnesses who provided enough pieces of the puzzle to convince the jury to convict Bracy and Collins and, in a separate proceeding, sentence them to death.

The court proceedings involving Bracy and Collins played out in a relatively routine manner until 1993, when Judge Maloney, who presided over their state court trial, was himself convicted of serious charges--he was taking bribes from defendants in criminal cases during the time period of the Bracy-Collins trial. United States v. Maloney, 71 F.3d 645 (7th Cir. 1995). Bracy and Collins did not bribe Maloney, but in the present petition they argue that their convictions and sentences violated due process because Maloney habitually came down harder on defendants who had not bribed him than he would have done had he not been on the take. He did this, they said, to deflect suspicion that he was soft on crime, a suspicion that might arise in cases where he unexpectedly acquitted or went easy on convicted defendants. Being hard on defendants who did not bribe him, Bracy and Collins contended, also inspired other defendants to offer bribes. In short, Bracy and Collins asserted that Maloney engaged in what has been dubbed "compensatory bias."

Exactly what Bracy and Collins must prove to prevail on this claim has twice divided a panel of our court and has at least peripherally engaged the attention of the Supreme Court. It continues to divide us, although there are principles on which we do not disagree.

The first area of agreement is that Maloney is not entitled to the usual presumption that ordinarily informs judicial bias cases--a presumption that public officials have "properly discharged their official duties." United States v. Chemical Foundation, Inc., 272 U.S. 1 (1926). We can indulge in no such presumption in this case. The Supreme Court said that "unfortunately, the presumption has been soundly rebutted: Maloney was shown to be thoroughly steeped in corruption through his public trial and conviction." Bracy, 117 S. Ct. at 1799. Secondly, we agree that the fact that Maloney was so exceedingly corrupt does not support a per se finding that every case over which he presided was

infected.

Our opinions diverge over exactly what the Supreme Court meant when it said that Bracy and Collins must show "that Maloney was actually biased in petitioner's own case." The phrase encompasses two concepts. One is "actual bias," apparently in contrast to the appearance of bias, which ordinarily supports a judicial bias claim. The second makes clear that the petitioners must connect the complained-of bias to their specific case. The former is somewhat of a surprising limitation on their claim; the latter less so. Also, we seem not to agree on what the petitioners' evidentiary burden is and how they can meet it.

First, actual bias. In Tumey v. Ohio, 273 U.S. 510 (1927), a prohibition-era case, the mayor of a village was empowered to try persons charged with unlawfully possessing intoxicating liquor. Under a village ordinance, the mayor could levy a fine against violators out of which the mayor was granted "his costs in each case, in addition to his regular salary, as compensation for hearing such cases." And therein lay the problem:  the mayor made extra money for his service as a judge if he convicted and fined those charged with breaking the law. For 6 months in 1923 the mayor received $696.35 from this process, a paltry sum, even adjusted for inflation, compared to Maloney's take. The Supreme Court concluded that the mayor was disqualified from hearing cases both because of his "direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." Id. at 533.

Revisiting the Ohio statutes in Ward v. Village of Monroeville, 409 U.S. 57 (1972), the Supreme Court considered the case of a mayor who was authorized to try municipal and traffic violations, but who was not personally entitled to pocket a share of any fines imposed. The Court found that a direct financial stake in the outcome "did not define the limits of the principle." The defendant was entitled to a neutral judge, which this mayor was not because money collected by the "mayor's court" benefitted the mayor when he wore his executive hat in

controlling the village's finances.

Even the absence of an indirect financial basis for a claim of bias was not enough to save the conviction in In Re Murchison, 349 U.S. 133 (1955), in which the Court was concerned with the appearance of bias. The Court concluded that the same judge who acted, under Michigan law, as a "one-man grand jury" could not preside over a contempt proceeding against a witness:

Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationship must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." [citing Tumey]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14.

Id. at 136.

In Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1986), the Court again based its finding of a due process violation on the appearance of bias. A justice of the Alabama Supreme Court sat on a case which established that punitive damages were available on a claim against an insurer, a case which was similar to one which the justice, himself as a plaintiff, had pending in an Alabama trial court. The Court was concerned with the temptation that the justice might not "hold the balance nice, clear and true." These cases tell us that ordinarily "actual bias" is not required, the appearance of bias is sufficient to disqualify a judge. But because of the language in the Supreme Court case in Bracy, we will focus today on actual

bias.

   The second concept--that the bias must
be found "in petitioner's own case"--is
not surprising. In each of the cases we
just discussed, the bias--or appearance
of bias--appears in the very case the
court is considering. That is not an
unusual requirement. A habeas petitioner
cannot show a due process violation in
his own case because, for instance, the
judge refused to suppress evidence in
another case--or even that the particular
judge hardly ever suppresses evidence at
the request of the defense.

   But the nature and extent of Maloney's
dereliction of duty casts this case in an
unusual light and makes it hard to put
Maloney in any normal framework. Not only
is he not entitled to any presumption of
fairness, but he is entitled to our
derision. Not only did he find himself
with the opportunity to show bias and
unfairness, he was a criminal who, by his
very presence on the bench, undermined
the foundation of our system of justice.
He was not a mayor presiding over an
ordinance violation case and setting a
fine, he was a racketeer sending men to
the death chamber in the name of the
State. It is hard to analyze what he did
by looking at cases involving municipal
fines or insurance claims. It is equally
hard to understand why his judgment
receives any level of protection.

   Our only explanation is that the unique
nature of this case may be why we need to
look for actual bias. Maybe it is because
the appearance of bias--or at least of
criminality--is so obvious. It may be
that we must be careful to tie our
analysis to actual bias in the present
case because Maloney was so obviously not
concerned with justice in other cases.
Whatever the reason, Bracy and Collins
have the heavy burden of showing actual
bias.

   The issue, then, is the means by which
they can meet their evidentiary burden.
Clearly, they can use evidence extrinsic
to the trial record in their case. After
all, the appeal to the Supreme Court
involved their right to take discovery.
But that discovery, as Judge Rovner
pointed out in her dissent in our panel
decision after remand, produced no
"smoking gun" or, as she also put it, no

"hard proof" of Maloney's motives. 248 F.3d at 609. That, according to our panel decision, is pretty much the end of the story. To a certain extent, we disagree.

We see no reason why Bracy and Collins can show bias only by finding a smoking gun, which in this case apparently would be Maloney's confession that he stacked the deck against them to take the heat off himself. Direct evidence of that sort is simply not available. But evidence short of a confession by Maloney is, as we will see, present to support their claim. From that evidence, reasonable in ferences can be drawn.

Furthermore, this is a death penalty case. Like all others sentenced to death, Bracy and Collins are entitled to our painstaking review of their convictions and death sentences because, as the Supreme Court has often recognized, death is different. See Gardner v. Florida, 430 U.S. 349 (1977), and cases cited therein. We review the factual findings of the district court for clear error. Legal issues are reviewed de novo. Bocian v. Godinez, 101 F.3d 465 (7th Cir. 1996). Having concluded that review, we see nothing that moves us to disturb the meticulous opinion of Judge William T. Hart in the district court (1) that it is more likely than not that Maloney engaged in compensatory bias in the death penalty phase of this case, or (2) that the evidence does not support such a finding in the guilt phase of the trial.

We have said that Maloney was a criminal, a racketeer, but these words do not convey just how serious his misbehavior was. First, we know he was convicted of racketeering, extortion, and obstruction of justice in gang-related murder cases. Maloney, 71 F.3d 645. His corruption made it possible for him to spend $400,000 more than he earned over 6 years ending in 1984. He was convicted of taking a bribe to acquit Lenny Chow, a hit man for a crime organization, who with two other men was charged in the murder of William Chin. Also with a bribe in his pocket, Maloney acquitted Owen Jones of a felony murder charge of beating a man to death during a burglary while convicting him instead on only a lesser charge of voluntary manslaughter.

Other cases show that Maloney was

capable of camouflaging his actions in some cases by compensating for it in others. He accepted a bribe of $10,000 to acquit two El Rukn gang members of a double murder, but he returned the money when he suspected (correctly) that the FBI was monitoring him. The Illinois Supreme Court granted these men a new trial because Maloney was motivated to convict them in order to deflect suspicion, a direct example of compensatory bias. The court said:

That Maloney subsequently returned the money did not render his interest in the outcome any less acute. As defendants suggest, he wanted to insure that he did not lose his judicial post and salary as a result of a criminal indictment, and therefore was motivated to return a verdict that would not spark the suspicions of authorities.

People v. Hawkins & Fields, 690 N.E.2d 999, 1004 (Ill. 1998). Similarly, a defendant named Dino Titone gave Maloney a $10,000 bribe, but Maloney convicted him anyway. Judge Earl E. Strayhorn, the Illinois judge presiding over Titone's post-trial motion, vacated the conviction because Maloney had a motive to convict Titone to deflect suspicion from himself. See People v. Titone, No. 83 C 127, post conviction transcript (Cir. Ct. Cook County, July 25, 1997), R239. Another example of Maloney's ability to cover his tracks came from the experience of attorney William Swano, a Maloney-briber in previous cases. This time, Swano represented a man named James Davis in a case which Swano evaluated as weak. In other words, Swano did not think a bribe was necessary in order to win an acquittal for Davis so no bribe was offered. Swano was wrong; Davis was convicted. At Maloney's trial, Swano testified that he construed the experience as a lesson that "to practice in front of Judge Maloney . . . we had to pay."

 At Maloney's sentencing, the United States Government submitted a version of his offense that is a blueprint for compensatory bias:

THOMAS MALONEY's corruption began at the time he was a criminal defense attorney paying off judges and court personnel to fix cases--including a notorious murder

case--and continued through the time he was a judge working as a mafia factotum in the Cook County Circuit Court system and taking all manner of bribes on very serious criminal cases. Thomas Maloney's reputation as a strict prosecution-oriented judge was no mistake. By casting this image, Maloney sought to deflect suspicion from his criminal activity, while simultaneously giving select desperate defendants who knew the right people an incentive to pay him off. Thus, by using his position as a felony trial court judge to extract bribes from defendants who face long periods of imprisonment or execution, THOMAS MALONEY far surpassed the category of corrupt jurist to chart a new territory of defilement.

   . . . .

   . . . [W]hen he got his turn on the bench, THOMAS MALONEY imposed a sinister system which had the dual effect of concealing and promoting his corruption. THOMAS MALONEY the former champion of the defendant became one of the most ruthless judges on the bench. Showing defendants little mercy had the effect of diverting any conceivable suspicion from MALONEY while at the same time giving defendants a strong motivation to cough up big bribery dollars.

We think this statement, the official position of the Government of the United States, accurately sums up Maloney's curriculum vitae.

  All this provides a framework for the petitioners' claim that, on occasion, Maloney engaged in compensatory bias. The task for Bracy and Collins is to connect his bias with their case and they must do it without being able to get inside Maloney's head. Their need to rely on circumstantial evidence arises because Maloney was not going to provide the link through some sort of confession. During discovery in this case he not only failed to admit that he took any untoward actions in this case:  As Judge Hart put it, he "vehemently and arrogantly denied all of the bribery charges clearly established by the jury findings and the evidence presented at his criminal trial." 79 F. Supp. 2d at 907.

  At his federal sentencing Maloney

pointedly remembered Bracy and Collins. As he was insisting, in the face of all evidence, that he had been an honest judge with a distinguished career, he cited as a credit to his record both the case of Hawkins and Fields, where we know he engaged in compensatory bias, and the trial of Bracy and Collins as well. What can we infer from this? One could say nothing at all; any inference that Maloney was motivated by the desire to deflect suspicion from himself is simply conjecture. Yet we think, in the context of this case, it was certainly appropriate for the district judge to consider this reference an indication that compensatory bias might very well have been at work in the Bracy-Collins case.

And there is more. Consider Maloney's appointment of Robert McDonnell as Bracy's attorney. In 1981 Bracy's original attorney was given permission to withdraw because Bracy ran out of money to pay him. Maloney appointed McDonnell to represent Bracy, and a short time later McDonnell announced that he was ready for trial.

Bracy alleged that McDonnell was appointed because he had been a partner of Maloney's, presumably a law partner, and because Maloney was looking to McDonnell to help ensure that Bracy would be convicted. Discovery in this case showed, however, that the two were never law partners. But it also showed that their connection was more troubling. Maloney and McDonnell knew each other and associated in some manner with Chicago organized crime families. When Maloney was a defense attorney in Chicago, his reputation was that of a "fixer." In 1977 Maloney represented his friend Harry Aleman, who was a "hit man for the mob." Aleman was charged with murder. According to Robert Cooley, a corrupt lawyer who became an FBI informant, Maloney paid the judge $10,000 and Aleman was acquitted.

Like Maloney, McDonnell was also considered an "outfit" lawyer. Not only that, but in 1966 McDonnell himself was convicted in federal court of conspiracy to distribute counterfeit money and was sentenced to 2 years in prison. In 1968 he was convicted of income tax evasion. When he was released from prison for that offense in 1972, he was disbarred. He was

reinstated to the bar in 1980 and approached judges in criminal court for appointments. It was, as we said, in 1981 that he was appointed to represent Bracy. Later, in 1989, McDonnell was convicted of conspiracy to defraud the government and solicitation to influence the operation of an employee benefits plan. This time he was sentenced to 6 years, and in 1990 he withdrew his name from the Illinois roll of attorneys to save himself from disbarment.

What this reflects is that McDonnell did not have a highly developed ethical sense. It does not mean he did not have legal skills--though not enough, apparently, to escape detection himself. We think it's fair to infer that if Maloney wanted a lawyer with questionable ethics, McDonnell was his man. Furthermore, in what could be construed as an attempt to deflect suspicion, after the Supreme Court decision in this case, Maloney, who was in prison, called McDonnell to obtain McDonnell's signature on an affidavit which stated that it was actually Bracy who chose McDonnell as his attorney. McDonnell testified that he did not remember it that way.

So far we have a corrupt judge with mob connections, who attempts to cover his tracks, and is now a convicted felon. We have a defense lawyer, also with organized crime ties, who is also a convicted felon. Both are engaged in the trial of two men who are in serious danger of being sent to the death chamber. With that as the setting, we will now turn to the record to see whether there is any evidence from which to infer that Bracy's and Collins' due process rights at trial or during the death penalty hearing were violated in a manner that can best be explained by Maloney's desire to appear tough.

Our analysis is informed by the principle that there is no harmless error analysis relevant to the issue of judicial bias. Edwards v. Balisok, 117 S. Ct. 1584 (1997); Cartalino v. Washington, 122 F.3d 8 (7th Cir. 1997). In other words, it does not matter that we might conclude that any jury would have been likely to convict Bracy and Collins and approve death as their penalty no matter what their attorneys tried to do for them. Nor does it matter that a

questionable ruling might have been found to be harmless by another court.

First, the guilt phase of the trial. The district court examined the discretionary rulings at the trial and found that there was no basis for concluding that the rulings were tainted by Maloney's attempt to deflect attention from his corruption in other cases. The petitioners contended, for instance, that Nellum committed perjury. They argued that pieces of rope alleged to be consistent with the type of rope used to bind one of the victims were entered into evidence, despite the fact that the rope was very common and could have been purchased in any hardware store. These weak complaints, similar to those in many other trials, do not allow an inference of actual bias. Bracy and Collins also complained that Maloney refused to suppress photographs showing Collins in a broad-brimmed hat, which was consistent with a witness's statement regarding his appearance on the night of the murders. Maloney chose to believe the police, rather than Collins, regarding how and where the photos were seized. Findings of this sort, which judges often make favoring a law enforcement version of conflicting events, do not support a claim of actual bias. We agree with Judge Hart that no discretionary rulings during the guilt phase of this trial lead to an inference that Maloney was actually biased against Bracy and Collins.

The penalty phase of the trial is another matter. In Illinois, that phase is divided into two parts. First, the jury decides if a defendant is eligible for the death penalty. To be eligible, he must be at least 18 years old and the crime must have involved one of the factors set out in the statute. Once a defendant is found eligible for the death penalty, the focus shifts to factors in aggravation and mitigation. Unless mitigating factors are sufficient to preclude the imposition of the death sentence, the defendant shall be sentenced to death. 720 ILCS 5/9-1, formerly Ill. Stat. ch. 38, par. 9-1.

In evaluating Maloney's rulings at the penalty phase of this proceeding, we are again mindful that death is indeed different. In a separate opinion in Spaziano v. Florida, 468 U.S. 447, 468

(1984), Justice Stevens pointed out that in the 12 years that passed since Furman v. Georgia, 408 U.S. 238 (1972), "every Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense." Those safeguards, we think, are found not just in the statutory provisions of any given state, but also in the manner in which those provisions are implemented in trial courts. Additionally, while the guilt phase of a trial is largely objective, involving cold, hard facts about what happened, a death penalty hearing often involves a good deal of subjective evidence. Evidence in mitigation often consists of testimony about what damaging forces a defendant has endured in his life or what kind of a person he otherwise is. We should not be misunderstood to be saying that rulings at the guilt phase are subject to a harmless error analysis, whereas in the penalty phase they are not. As we said earlier, harmless error does not apply to claims of judicial bias, ever, even in cases involving insurance payments or municipal ordinance violations, to say nothing of first-degree murder trials. But when we are dealing with alleged judicial bias, the nature of evidence in aggravation and mitigation requires us to look at the penalty phase with a skeptical eye, keeping in mind that as the trial judge, it was Maloney's solemn responsibility to see that the death penalty hearing was fair. He failed miserably. And his failure was so egregious that it supports an inference that he failed, consciously or unconsciously, because of compensatory bias. If the death penalty hearing had been scripted, it could not have been more damaging to Bracy and Collins.

We recall that McDonnell said he would be ready for trial a few weeks after he was appointed as Bracy's attorney. But an examination of the record shows, although it turned out that he was adequately prepared for the guilt phase of the case, he wasn't prepared for the penalty hearing, nor could he have been. It was not until the beginning of the trial that the prosecutor announced that at the

penalty phase he planned to introduce, as an aggravating factor, evidence that Bracy was charged with murdering two people in Arizona. So McDonnell was about to embark on a jury trial in which his client was charged with three murders. And if Bracy were convicted, there would be evidence of two more, as yet unproven, murders committed in another state. We doubt McDonnell could possibly have been fully prepared for the penalty hearing.

When the guilt phase was over and the penalty hearing about to begin, McDonnell objected to the use of the Arizona murders as aggravating factors because there had been, as yet, no conviction in Arizona. Maloney seemed at first to agree that the use of the testimony was questionable. He said:

It hasn't been tried? On what authority are you going to introduce or attempt to introduce it here?

Later he said, "Just assuming here if that were the case and then he were to be acquitted there and you had used part of the same evidence. Then where would we stand here?" On this point, Collins' attorney, Irvin Frazen, asked for a severance. He was concerned that the Arizona evidence against Bracy would spill over onto Collins. Ultimately, Maloney denied Collins' severance motion and, without saying why, determined that the Arizona evidence would be admitted.

McDonnell then did the next best thing; he appropriately asked for a continuance so he could properly prepare for the explosive Arizona evidence. He complained that he had recently been provided 80 pages of information about the Arizona case. The government said only 3 pages of the 80 pages were relevant. Apparently the prosecutor's assessment was allowed to prevail; again without giving a reason, Maloney decided that the death penalty hearing would proceed against both defendants: "We are not adjourning anything for a week or ten days. We are proceeding, as a matter of fact."

The evidence of the Arizona murders was admitted and it was inflammatory. It was the story of a nasty home invasion resulting in the brutal murder of two people. The survivor of the attack was the wife of one of the victims and the daughter of the other. She identified

Bracy as one of the attackers.

The Illinois Supreme Court found no error in the refusal to grant a continuance because Bracy was not prejudiced by the introduction of the evidence. That was true, the court said, because by the time of the appeal Bracy had, in fact, been convicted in Arizona:

If we were to find the denial of the continuance to have been improper and remand for a new sentencing hearing, the State would then introduce Bracy's Arizona convictions into evidence, thus raising an even stronger inference that Bracy committed the Arizona crimes.

478 N.E.2d at 286. This sounds to us more like a finding of harmless error than a finding that Maloney's discretion was properly exercised. Our job is different from that of the Illinois Supreme Court. We need to view Maloney's actions as of the time of trial. At that time, he could not have known that Bracy would be convicted, and for that matter there was even some doubt that Bracy would actually be tried in Arizona. In the context of a capital sentencing hearing on an issue on which harmless error does not apply, Maloney's ruling, even if supportable on a direct appeal as not being an abuse of discretion, lends support to an inference that he was showing compensatory bias. It is more than a fair inference that increasing the likelihood of the imposition of the death penalty would be fine with Judge Maloney.

Later, McDonnell again objected to the Arizona evidence, saying that it had come to his attention that there was a 1980 case presumably supporting his position that the evidence was inadmissible "although I do not have the citation." When asked if he had a case on point, McDonnell said, "McDonnell/2 on common sense." He repeated that he did not have the citation. He said, "I will try to find the case. If I can't find it, the Appellate Court can find it or the Supreme Court." Maloney said "All right." Less concern about the fate of the defendants and the importance of this discretionary ruling on the admissibility of explosive evidence could hardly be imagined.

Finally, mitigation. No evidence in

mitigation was presented as to Bracy and little was offered as to Collins. Yet evidence in mitigation is crucially important in death penalty litigation. In Lockett v. Ohio, 438 U.S. 586, 604 (1978), the Court said that the "sentencer" must not "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." See also Buchanan v. Angelone, 522 U.S. 269 (1998).

Maloney was sublimely unconcerned about a lack of evidence in mitigation, as unconcerned as he was about McDonnell's lack of preparation for meeting the Arizona evidence. In fact, Maloney even tried to discourage McDonnell from making a closing argument at the death penalty hearing.

MR. McDONALD [SIC]: Wait a moment, judge.

THE COURT: What do you want?

MR. McDONALD: I want to argue.

THE COURT: You do?

MR. McDONALD: Certainly.

Maloney then called for a side-bar conference:

THE COURT: You don't have to argue in this case.

MR. McDONALD: I want to argue.

MR. FRAZIN: Arguments are part of it.

THE COURT: They can be but they don't have to be.

Ultimately, arguments were allowed.

McDonnell seemed to do the right thing in insisting on argument. But given his inability to counter the Arizona evidence because of Maloney's denial of the continuance, he had nothing to say about the State's evidence in aggravation. With no evidence in mitigation, he had nothing to talk about on that score as well. So it should come as no surprise that his "argument" was simply a tirade against the death penalty:

This is a human being and we don't have the right to take another person's life. Only God can do that. God gave us this life and only God can take it away, and I don't care, none of us have the right to take a fellow human being's life, not Bracy, not his Honor, not the prosecutor, and not you people.

   Not only is this sort of argument inadmissible in a sentencing hearing, see People v. Williams, 454 N.E.2d 220 (1983), but, worse, it "invited" the prosecution to come back with an incendiary retort of its own--that to say the death penalty is wrong is to malign all veterans:

I've heard that before. People in 1941 through 1945 killed in the name of their country [at which time an objection was overruled] in service to their country. Some of us went to Viet Nam and had to kill for this country, and I will be damned if anybody is going to tell me that what we did in Viet Nam or in any other war was a violation of the Fifth Commandment of the Bible.

Later, the prosecutor referred to McDonnell's argument as "a slap in every veteran's face."

   The prosecutor also alluded to the chance that Bracy and Collins might "escape from Stateville" again if they were given another chance: "Should we give them another chance; lock them up and give them a chance to escape and kill someone else?"

   The Illinois Supreme Court noted that the prosecution's remarks were a "bit dramatic" but rejected the claim that they constituted reversible error because, the court said, "there is no question that they [the prosecutor's remarks] were invited." We agree. The remarks were invited. McDonnell's argument was so objectionable that it is hard to see how he or Maloney could not have known what type of response the prosecution was going to make to it. It is pushing credibility to imagine that an experienced trial judge (for Maloney was experienced, if not honest) did not see this scene unfolding. The prosecutor repeatedly called Maloney's attention to the objectionable nature of McDonnell's

argument. Yet Maloney did nothing. Imposition of the death penalty was a foregone conclusion in this case.

Had the prosecutor's comments not been invited, it seems likely that the courts of Illinois might very well have ordered a new death penalty hearing for Bracy and Collins a decade ago. In Murray Hooper's first appeal, the Illinois Supreme Court vacated his death sentence. Hooper, as we have said, was charged along with Bracy and Collins with the murders in the present case. In Hooper's case the prosecutor speculated that if he were placed in prison for life, Hooper might very well kill a guard or a chaplain. Relying on cases where it found a reference to parole and to the possibility of committing more murders improper and prejudicial [People v. Walker, 442 N.E.2d 83 (1982); People v. Gacho, 522 N.E.2d 1146 (1988)], the court vacated Hooper's death sentence. People v. Hooper, 552 N.E.2d 684 (1989). Reference to escape from prison in Bracy's and Collins' case can hardly be less damaging than reference to the possibility of parole in Hooper's. It seems likely that if McDonnell had not set the prosecutor up so nicely, and if Maloney had not been so deliberately indifferent to the petitioners' fates, the death sentences imposed on Bracy and Collins might, like Hooper's, have been vacated many years ago.

What possible motive could Maloney have had to allow such gross impropriety at this hearing? We feel compelled not to shirk from seeing the strong inference, given what we now know about Maloney, that he deliberately let this death penalty hearing become a debacle because imposition of the death penalty on these two men would bolster his reputation as a tough judge. We must do no less than Judge Strayhorn who, while recognizing the extent of Maloney's corruption, also recognized that in the Titone case he could not be certain about the role corruption might have played. He said, "I'm always faced with the fact that I can't answer the question of was he tried in a fair tribunal before a judge who gave him a fair and an honest trial. And I must always stop and say that honestly I don't know." But he also said, "no amount of procrastination on my part, no amount of reluctance on my part can wipe

out the fact that . . . what went on in that courtroom as to Dino Titone was not justice." He ordered a new trial.

In our case, it is a fair, if not inevitable, inference that Maloney used the death penalty hearing to deflect suspicion that might be aroused because of, say, his acquittal of another accused murderer who had bribed him. Without a confession from Maloney, we never will know for sure. But absolute certainty is not required. The burden we place on petitioners never is absolute. Defendants--especially defendants facing death--have a right under the Due Process Clause to a "fair trial in a fair tribunal." Withrow v. Larkin, 421 U.S. 35, 46 (1975). We think this means they have a right to a judge who takes seriously his responsibility to conduct fair proceedings, a judge who looks out for the rights of even the most undeserving defendants. Maloney fell far short of that mark. Given all the other circumstances that show Maloney's utter disregard for justice, we think the inference that compensatory bias was at work in the death penalty phase of this case is a more compelling explanation for Maloney's actions than things like incompetence, negligence, happenstance, or accident. The judgment affirming the convictions of William Bracy and Roger Collins but vacating their death sentences is AFFIRMED. The State may proceed, at its discretion, with a new penalty hearing as directed by the district court. The case is REMANDED to the district court for further proceedings.

FOOTNOTES

/1 As noted in prior court decisions in this case, "Bracy" is sometimes spelled "Bracey." We have used the "Bracy" spelling and have changed the spelling in other cases we cite to conform to ours.

/2 The court reporter often referred to McDonnell as McDonald and actually did so here, typing the statement as "McDonald on common sense."

Posner, Circuit Judge, with whom Easterbrook and Manion, Circuit Judges, join, concurring and dissenting.

I agree that the convictions should stand (though my reasoning differs from Judge Evans's), but not that the death sentences should be reversed. Judge Maloney, whose alleged bias is the only issue in this appeal, presided over both phases of the case. There is no basis for supposing him unbiased until the defendants were convicted, then biased at the sentencing hearing. Such a supposition offends common sense. What must be driving the outcome of the appeal is a sense of discomfort with Maloney's antics that is too great to contemplate executions without acute distress but not too great to contemplate life sentences. That is the only meaning I can assign to Judge Evans's reference to a "toxic mix." For Bracy and Collins have failed to show that they were denied due process of law either at trial or in sentencing. To reverse their sentences is merely to compound Maloney's wrongdoing. To reverse while upholding the convictions is an unprincipled splitting of the difference, rather than legal justice. It is the sort of thing an arbitrator might do or a mediator propose. It would be understandable as a settlement; it is indefensible as a judgment.

Bracy and Collins were convicted in 1981 by a jury in an Illinois state court of three gangster-style murders committed the previous year, and were sentenced to death by the jury. We affirmed the denial of federal habeas corpus relief in Bracy v. Gramley, 81 F.3d 684 (7th Cir. 1996). The Supreme Court reversed, 520 U.S. 899 (1997), holding that Bracy had made a sufficient showing under Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts to entitle him to conduct discovery concerning his claim that Judge Maloney had been biased. The Court remanded Collins's case for reconsideration in light of its opinion in Bracy's case. Collins v. Welborn, 520 U.S. 1272 (1997) (per curiam).

Maloney had been convicted in a federal court in 1993 of various offenses relating to his having taken bribes from criminal defendants during a period that included the year of the petitioners' trial. See United States v. Maloney, 71 F.3d 645 (7th Cir. 1995). He had not solicited or received bribes from Bracy or Collins but they argue that he habitually came down harder on defendants who had not bribed him than he would have done had he not been taking bribes. He did this, they argue, both to deflect any suspicion that might arise in the cases in which he had accepted bribes and as a result acquitted or gone easy on the defendants that he was "soft" on criminals (which might endanger his reelection) and to increase the size and frequency of the

bribes offered him.

The Supreme Court held that "if it could be proved, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." 520 U.S. at 905 (emphasis added). In concluding that Bracy had presented enough evidence of such bias to entitle him to seek additional evidence through discovery, the Court focused on the contention that his trial counsel, Robert McDonnell, who had been appointed by Maloney to represent Bracy, had practiced law with Maloney before the latter had become a judge and that McDonnell "might have been appointed with the understanding that he would not object to, or interfere with, a prompt trial, so that petitioner's case could be tried before, and camouflage the bribe negotiations in," a contemporaneous case before Maloney. Id. at 908. The Court pointed out that "this is, of course, only a theory at this point; it is not supported by any solid evidence of petitioner's trial lawyer's participation in any such plan." Id. But if substantiated, this theory that Bracy's "trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged . . . cases might attract," id. at 909, would support "his claim that Maloney was actually biased in petitioner's own case." Id. (emphasis in original). The Court rejected the view of Judge Rovner, the dissenting judge in our court, that "petitioner was entitled to relief whether or not he could prove that Maloney's corruption had any impact on his trial. The latter conclusion, of course, would render irrelevant the discovery-related question presented in this case." Id. at 903 n. 4 (citation omitted). Regarding "the correctness of the various discretionary rulings cited by petitioner as evidence of Maloney's bias," the Court remarked that "many of these rulings have been twice upheld, and that petitioner's convictions and sentence have been twice affirmed, by the Illinois Supreme Court." Id. at 906 n. 6.

Twice the Supreme Court said that to provide a basis for relief for Bracy (and hence for Collins) compensatory bias must be shown "in petitioner's own case." This means that even if Maloney engaged in compensatory bias in some cases, this would not be enough to justify a conclusion that Bracy and Collins had been convicted and sentenced in violation of due process; they would have to prove that Maloney had been biased ("actually biased," as the Court

said) at their trial. Also noteworthy is the Court's approving reference to the description in our panel opinion of the theory of compensatory bias as "speculative": "The Court of Appeals, in its opinion, pointed out that this theory is quite speculative; after all, it might be equally likely that a judge who was 'on the take' in some criminal cases would be careful to at least appear to favor all criminal defendants, so as to avoid apparently wild and unexplainable swings in decisions and judicial philosophy." Id. at 906, citing 81 F.3d at 689-90.

Sometimes the temptation to bias is so great that proof of bias is not required. This is true when the judge has a substantial pecuniary stake in the outcome of the case or when he is bribed by one of the parties. See, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986); Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1370-80 (7th Cir. 1994) (en banc); Cartalino v. Washington, 122 F.3d 8, 11 (7th Cir. 1997). Given the difficulty of peering into a judge's mind, a high probability of bias is, in the absence of confession, the most that can ever be proved, and sometimes the objective circumstances alone are enough to establish the requisite probability or at least to establish that no ordinary person would believe that a judge would not yield to such a temptation. But it is apparent from the passages that I have quoted from the Bracy opinion that the Supreme Court does not regard the temptation to engage in compensatory bias as falling into the per se category, where proof of the temptation is enough to entitle a defendant to a new trial because the likelihood that the judge succumbed (perhaps quite unconsciously) is great. If it did fall into the per se category, as Judge Rovner had argued it should, there would have been no occasion to conduct discovery, since the existence of the temptation was conceded and the only question was whether Maloney had yielded to it, either generally or in the trial of Bracy and Collins. The Court thought it crucial to determine whether Judge Maloney had succumbed. Later we decided a case involving a different corrupt judge, Cartalino v. Washington, supra, in which the requisite proof was supplied: the bribery scheme included convicting Cartalino. There is no evidence that convicting Bracy and Collins was part of Maloney's bribery scheming.

If the mere possibility of compensatory bias were enough to establish actual bias, all decisions by a judge who accepted bribes would be invalidated--in the case of Judge Maloney, literally thousands. That is another distinction between compensatory bias and a financial stake (or family relationship). A financial stake is

case specific. The temptation it offers the judge is limited to the case in which he has a stake. His other cases are unaffected. But the theory of compensatory bias implies that all the judge's decisions in criminal cases are fatally contaminated--the cases in which he was bribed, of course, but also the cases in which he was not bribed; and so--all his cases. The Supreme Court did not adopt and would not countenance a rule that compensatory bias can be presumed from the fact that a judge has accepted bribes in some cases. Judge Rovner's opinion in the present round disregards the Supreme Court's mandate. She repeats the position she took in the original appeal-- the position the Court disapproved--that all of Maloney's convictions (and presumably those of any other bribe-taking judge) must be set aside and that case-specific evidence of compensatory bias is always unnecessary, and indeed irrelevant. The Court made unmistakably clear that compensatory bias must be proved to have been operative in the particular defendant's case. Proof of this is not impossible, as Cartalino illustrates. Bias could also be inferred, much as discrimination often is inferred, from a pattern of rulings that could not be satisfactorily explained on any hypothesis other than that of compensatory bias. The evidence need not always be case specific. Maloney was deposed as part of the discovery conducted on remand. Had he testified that he had practiced compensatory bias in all the cases in which he had not been bribed, and his testimony had been believed, or if evidence had been presented of a conspiracy to practice compensatory bias in every case in which no bribe was offered to the judge, an absence of evidence about the motive for his rulings in the trial of particular defendants who had not offered bribes would not be fatal. (It wouldn't even matter if he didn't remember the trial at all.) All that had to be established in the remand proceeding that the Supreme Court ordered, in order to justify ordering a new trial for Bracy, was a factual basis for inferring that Maloney probably did harbor an actual bias against him.

That could not be inferred, however, from the fact that Maloney took bribes or even from the fact, if it was a fact, that he practiced compensatory bias, for he may not have done so in every case. We do not know whether he practiced it in any case; and he would have been unlikely to practice it in every case. If he thought that a defendant was certain to be convicted and receive a severe sentence, he would have no incentive to lean in favor of the prosecution and by doing so jeopardize the conviction or sentence by making it more vulnerable to reversal on appeal. In general a corrupt criminal judge has

no need to lean against criminal defendants who have not bribed him, because most criminal defendants are guilty and will be convicted anyway.

The discovery ordered by the Supreme Court drew a blank. Much of it consisted of a wild goose chase after McDonnell's relationship to Maloney. The chase did uncover ugly evidence of criminality and mob ties of both McDonnell and Maloney, but nothing that bore on the issue of compensatory bias--except to dispel the suspicion that Maloney had appointed McDonnell to make sure that Bracy would be convicted, or that McDonnell had tried to throw the case in order to curry favor with Maloney. The judge found that McDonnell had never practiced law with Maloney and had pulled no punches in his defense of Bracy. This finding is not clearly erroneous, and so it binds this court and wipes out the theory of bias that was the focus of the Supreme Court's discussion of the need for discovery.

It is true that during his allocution before being sentenced Maloney had spoken of the convictions and sentences of Bracy and Collins as "a credit to his record as a judge and evidence that he was not corrupt," 79 F. Supp. 2d at 907, and that this led the district judge to find (id. at 908) that

during the same time petitioners' case was pending, other cases were pending in which Maloney took bribes, particularly the close in time Chow and Rosario cases. Before and after this time, Maloney was engaged in a pattern of receiving money. Based on the evidence in the record, it is a possible and reasonable inference in this case that Thomas Maloney was motivated, at least in part, to maintain a prosecution-oriented attitude and to make pro-prosecution rulings by a desire to deflect suspicion from cases in which he accepted bribes. Other documented instances of Maloney so acting to deflect suspicion from his corrupt conduct are reported in the Hawkins and Titone cases.

This is naked conjecture, however, and so cannot be the basis of a valid factfinding. Libman Co. v. Vining Industries, Inc., 69 F.3d 1360, 1363 (7th Cir. 1995); United States v. Givens, 88 F.3d 608, 613 (8th Cir. 1996); Thompson v. Washington, 266 F.2d 147, 148-49 (4th Cir. 1959) (per curiam); In re Kuttler's Estate, 8 Cal. Rptr. 160, 169 (Cal. App. 1960) ("an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without

evidence"). It was natural for Maloney, at his sentencing for accepting bribes from criminal defendants, including defendants in murder cases, to point to a case before him in which the murderers had been convicted and sentenced to death, though the jury, not he, had convicted them and had made a recommendation for death that bound him ("recommendation" is thus a misnomer). It does not follow that when he presided at trial he was thinking of how the defendants' convictions and sentences might stave off future accusations of bribe taking, or even how they might dispel suspicions of it--if he was even aware at that time, early in his bribetaking career, that there were any suspicions; probably he was not, or he would not have continued taking bribes for nine more years. The two cases the district judge gave as examples of Maloney's "acting to deflect suspicion from his corrupt conduct" are cases in which Maloney accepted bribes; in one he returned the bribe because he realized that he was under investigation and in the other he convicted the defendant anyway. Neither case had anything to do with compensatory bias. He returned the bribe five years after the trial of Bracy and Collins; there is no indication that he was, or thought he was, under suspicion at the time of that trial.

The district judge based his conclusion about Maloney's motivation largely on the "Government's Official Version of the Offense" submitted in Maloney's criminal trial. This document, which the parties refer to as the sentencing recommendation or sentencing memorandum, is also the cornerstone of the appeal. In it the Justice Department accused Maloney (whom it called "degenerate" and "a mafia factotum") of practicing compensatory bias. The document consists, however, of 57 single-spaced pages, and the allegation of compensatory bias appears on just one of them. It is colorful ("THOMAS MALONEY far surpassed the category of corrupt jurist to chart a new territory of defilement"), vivid, even plausible. But no substantiation or elaboration is offered. No cases in which Maloney may have engaged in compensatory bias are cited; no evidence, direct or circumstantial, admissible or inadmissible, that he ever engaged in the practice is offered. The Justice Department was pressing for a very long sentence (more than 20 years), and it pulled out all the stops.

Despite this "evidence" of compensatory bias, the district judge concluded that "the evidence does not establish that an interest in covering up wrongdoing or motivating larger bribe payments pervaded every action taken by Maloney as a judge. Maloney's bribe taking has not been shown to have been so pervasive a part of his judicial

practices that it can be assumed he was always, or even usually, motivated by his pecuniary and/or penal interests when exhibiting his prosecution-oriented tendencies." Id. at 909 (emphasis added). This is an important finding, which not being clearly erroneous binds us. It requires (as the Supreme Court had already made clear) evidence that compensatory bias was at work in this case. It forbids us to rest on a presumption that compensatory bias was at work in every case in which a defendant tried before Judge Maloney was convicted.

In the light of this finding, the district judge as he was required to do examined Maloney's rulings at the trial of Bracy and Collins and found none at the guilt phase of the trial that displayed bias. He concluded that the convictions were untainted. The conclusion is correct. For all that appears, Maloney was a prosecution-minded judge for reasons unrelated to his taking bribes. That he would accept bribes to acquit criminals does not imply any affection for criminal defendants or their lawyers such that he must have been acting against character when he ruled in favor of the prosecution in cases in which he was not bribed. His conduct was appalling, his character depraved, but the bridge to the trial of Bracy and Collins is missing.

However, turning to Maloney's rulings at the sentencing phase of the trial, the district judge found the taint of compensatory bias. The only ruling (or pair of rulings) he mentioned was Maloney's refusal to sever Collins's sentencing hearing from Bracy's and hold it first in order to give Bracy's lawyer more time to prepare for his client's hearing. The ruling is said to have harmed Collins because it meant that the jury would hear evidence about additional murders that Bracy had committed in Arizona, murders in which Collins had not been implicated. (Bracy had not yet been convicted of the Arizona murders; later he was, and he was sentenced to death; that sentence is pending.)

Collins had not raised the issue of severance in his state-court appeal, and as a result it was treated as forfeited in the federal habeas corpus proceeding. It is not surprising that he didn't raise the issue, because it is very difficult to see how he would have been harmed, rather than helped, by evidence that Bracy was a worse murderer than he. And so it is difficult to see how the ruling could be thought evidence of bias. But all this to one side, there is no basis for upholding Bracy's and Collins's convictions but setting aside their sentences. The incentive to engage in compensatory bias is stronger at the trial of guilt than at the sentencing hearing.

Most criminal defendants are convicted, so a judge who wants a reputation as a tough sentencer, either to induce bribes or to avoid charges of undue lenity, will have an incentive to make rulings favorable to the prosecution, so that the defendant will not walk. Had these triple-murdering defendants been acquitted, eyebrows might have been raised. But the imposition of the death sentence is a matter of grace to be determined by the jury. Maloney would not have been "blamed" if the jury had exercised its unreviewable power of lenity and declined to recommend sentencing Bracy and Collins to death. For all we know, that is a common sequel to the conviction of defendants in capital cases in Illinois.

The only thing on which Judge Evans can hang the distinction between the sentencing phase and the guilt phase of the trial, moreover--the refusal to try Bracy and Collins separately--was before the Supreme Court when in remanding the case to us it made clear that Bracy and Collins could prevail only if discovery disclosed evidence of compensatory bias. It did not.

There is a lot of "death is different" talk in Judge Evans's opinion. Maybe he wishes to suggest that compensatory bias has a different meaning in capital-sentencing than in other proceedings. That's a position Bracy's own lawyer rejected at the en banc argument. He was emphatic that compensatory bias if proved would invalidate a misdemeanor conviction or for that matter a judgment in a civil case; Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986), on which he heavily relied, was a civil case. He was right. A civil litigant and a misdemeanor defendant are entitled to an unbiased judge, just like a capital defendant. The Supreme Court's elaborate jurisprudence on the death penalty does not include a special standard of judicial bias for capital cases only. When compensatory bias is shown, the losing party is entitled to relief regardless of the nature of the case.

The capital nature of this case is relevant only in the following very limited sense: a judge conceivably might be biased in one stage of a case but not all stages, so if there are severable stages, such as the guilt and sentencing phases of a capital case, bias at the last stage might not spill back into the earliest stage. If anything, as I have pointed out, Judge Maloney was more likely to be biased against defendants at the guilt stage of the proceeding than at the sentencing phase. There is nothing to suggest that he was indifferent to whether they were convicted but determined if they were convicted to see that they were executed. Nothing

in the theory of compensatory bias or in thepsychology of Maloney supports such a conjecture. Critically, there is no evidence to support it.

   No evidence, but plenty of rhetoric. Judge Evans states: "It is more than a fair inference that increasing the likelihood of the imposition of the death penalty would be fine with Judge Maloney." And: "Less concern about the fate of the defendants . . . could hardly be imagined." And: "Maloney was sublimely unconcerned about a lack of evidence in mitigation." And: "It is pushing credibility to imagine that an experienced trial judge . . . did not see this scene unfolding." And: "Maloney [was] deliberately indifferent to the petitioners' fates." From this it is inferred that Maloney "deliberately let this death penalty hearing become a debacle because imposition of the death penalty on these two men would bolster his reputation as a tough judge." But the judge does not impose the death penalty; the jury does. And of course Maloney might have wanted a reputation as a tough judge for reasons unrelated to compensatory bias. And he might not have been seeking a reputation as a tough judge--he may just have been disgusted by these defendants' crimes, or he may have been a bad judge, or he may have thought capital punishment the right punishment for murderers, or he have been pro-prosecution on general principles, or all these things may have been true. In failing to canvass these possibilities, Judge Evans's opinion reveals a lack of imagination. Furthermore, Maloney's rulings at the guilt phase of the trial also consistently favored the prosecution, as Judge Evans's opinion fails to make clear; it is no surprise that Maloney's rulings at the sentencing hearing favored the prosecution as well. If Maloney was not biased in presiding at the guilt phase of the trial despite his consistent leaning in favor of the prosecution, how as a matter of logic and common sense can we have any confidence that he suddenly, inexplicably--indeed  irrationally-- became biased at the penalty phase?

   The language that I have quoted from Judge Evans's opinion really points in a different direction--toward a conclusion that Maloney created an "appearance of impropriety," concretely that he gave the appearance of being determined to do in Bracy and Collins. Not only need such a determination have nothing to do with compensatory bias, but in an earlier en banc opinion of this court that Judge Evans's opinion neglects to discuss we held that a judge's mere appearance of impropriety does not render a judgment in violation of due process. Del Vecchio

v. Illinois Dept. of Corrections, supra, 31 F.3d at 1371-72; see also id. at 1389, where this ruling is elaborated. Appearances and suspicions are all that the court has going for it in this case.

The judgment of the district court should be affirmed insofar as it upheld the convictions but it should be reversed insofar as it invalidated the sentences.

ROVNER, Circuit Judge, with whom RIPPLE, DIANE P. WOOD, and WILLIAMS, Circuit Judges, join, concurring in part and dissenting in part. This case demands that we give concrete meaning to a cornerstone of our justice system--an impartial judiciary. The right to a fair and unbiased judge is undisputed. Bracy v. Gramley, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 1797 (1997). But as with any constitutional safeguard, proof of the right lies in its enforcement. See Davis v. Passman, 442 U.S. 228, 241-42, 99 S. Ct. 2264, 2275 (1979). Here we are asked to decide whether a judge who was actively engaged in bribe-taking could be (and was) impartial in a case where no bribe was tendered, or whether his financial and penal interests tainted his decision-making even when no money changed hands.

Any inquiry into what motivates a judge to rule is perilous. Our concept of justice depends on the notion of an impartial judiciary, and yet we know that true impartiality in a judge is no more than an aspiration. Judges are human beings, and so they can never completely transcend the limits of their own experiences and perspectives. In the usual case, then, we abstain from looking behind a judge's rulings, content to treat his oath of office as sufficient proof that he acted free from bias. "As Blackstone put it, 'the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.'" Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820, 106 S. Ct. 1580, 1584-85 (1986), quoting 3 W. Blackstone, Commentaries, at *361. Here we cannot sweep human nature under the rug. Maloney did not simply try but fail to administer justice impartially; he deliberately and repeatedly abandoned his oath of neutrality for his own gain. We know that Maloney accepted bribes to fix at least four cases, and the hundreds of thousands of dollars in expenditures for which his reported income does not account raises the distinct possibility that these were merely the tip of theiceberg. See R. 161 Exs. 53, 54;

Collins v. Welborn, 79 F. Supp. 2d 898, 907 para. 40 (N.D. Ill. 1999).

Ironically, the fact that Maloney was a corrupt judge makes it harder rather than easier for us to decide whether he was an impartial decisionmaker in the petitioners' case. The evidence has not given us a direct look into Maloney's mind, so we have no way of knowing for certain whether Maloney acted from a position of bias or impartiality when he presided over the trial of Bracy and Collins. We must instead look to his rulings at trial, and to the circumstances surrounding his bribe-taking, for clues as to his motives and disposition. And the absence of evidence that can definitively confirm or dispel the possibility of bias presents us with a choice between two unappealing courses of action. We can infer from the circumstances that Judge Maloney's corruption rendered him partial and vacate the petitioners' convictions, a step that will necessitate a retrial many years after they were convicted. To Judge Posner's way of thinking, this simply compounds the wrong that Judge Maloney committed by accepting bribes. Ante at 23. Or, in the absence of direct proof of bias, we can cling to the notion that Maloney was a fit and fair judge so long as he was not bribed. To say that a serial bribe-taker meets the constitutional standard of impartiality, however, is a hard pill to swallow. Judge Evans appropriately asks why the decision-making of a corrupt judge is entitled to any protection at all. Ante at 8.

I submit that the question would be much easier to answer if we were asked to decide it ex ante. Suppose for a moment that a district judge within our jurisdiction announced on his first day of service that he was sworn to be impartial and that he would give the parties a fair trial unless the defendant wished to bribe him, in which case he would give the defense a leg up. That is essentially how Judge Posner postulates that Maloney operated--that he gave the parties a fair trial unless bribed to do otherwise; it is just that Maloney did not announce his bribe-taking to the world. But imagine for a moment that our hypothetical judge did. If a defendant unwilling to tender a bribe--or for that matter the prosecutor--sought mandamus complaining that, in view of the announcement, the judge did not constitute an impartial decisionmaker, I very much doubt that we would deny the request with an admonition that so long as no bribe was tendered, the parties had nothing to worry about. The judge's removal from the case and from the bench would be swift and certain.

Our inquiry in this case is burdened by the

fact that Judge Maloney's bribe-taking was not exposed until after he had been a trial judge for many years. The question really is no different than the one we would have to answer in my hypothetical, but the ramifications are more weighty. Maloney presided over the disposition of thousands of cases, and recognizing his lack of impartiality in one case presents the prospect that all of the cases he handled must be vacated. Indeed, that uncomfortable prospect is the one and only justification that has been offered over the long history of this litigation for concluding that a thoroughly corrupt judge amounts to a constitutionally acceptable decisionmaker. We acknowledge that Maloney's conduct was appalling, that his crimes showed contempt for his office, but we say nothing about why, doctrinally, a judicial racketeer should be considered a fair and impartial decisionmaker.

In most cases, of course, we may simply presume that the trial judge was impartial. E.g., Schweiker v. McClure, 456 U.S. 188, 195, 102 S. Ct. 1665, 1670 (1982). But, as the Supreme Court has recognized, that presumption has been "soundly rebutted" in view of Maloney's extensive history of corruption. Bracy, 520 U.S. at 908-09, 117 S. Ct. at 1799. The Supreme Court concluded that the dissipation of the presumption amounted to "good cause" which entitled Bracy and Collins to discovery so that they might attempt to show bias. Id. at 908-09, 117 S. Ct. at 1799. As Judge Evans appropriately recognizes, it also establishes the starting point for our review of the results of that discovery. Ante at 5.

Before we proceed further, however, we must ask who bears the burden of establishing Maloney's impartiality or lack thereof, given that the presumption of impartiality has already been rebutted. Both Judge Evans and Judge Posner assume that it is the petitioners' burden to show bias. See ante at 5, 25. Given the fundamental nature of the constitutional right in question and the gravity of Maloney's misconduct, however, I wonder if that is right. Judicial bias is among the kind of structural errors which implicate both the fundamental fairness of the trial and society's perception of the integrity of the process. See United States v. Harbin, 250 F.3d 532, 543 (7th Cir. 2001). Consequently, judicial bias if proven requires automatic reversal; as Judge Evans notes, it is not subject to harmless-error review like most trial errors. Ante at 14; see Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S. Ct. 2078, 2081 (1993), citing Tumey v. Ohio, 273 U.S. 510, 535, 47 S. Ct. 437, 445 (1927). Here, of course, the issue is whether bias has been shown. In the usual case, it would be the petitioners' burden to make that showing.

Schweiker, 456 U.S. at 196, 102 S. Ct. at 1670. Yet, we all recognize the inherent difficulty of peering into the mind of a corrupt judge and assessing whether he had a wish to see these particular petitioners convicted and/or sentenced to death. Ante at 9, 26; see Cartalino v. Washington, 122 F.3d 8, 11 (7th Cir. 1997). Not surprisingly, given Maloney's ongoing protestations of innocence and the invocations of the Fifth Amendment among his cohorts, Bracy and Collins have not secured an admission that Maloney invariably engaged in compensatory bias or that he did so in this particular case. See ante at 27-28. What they have shown, however, is that Maloney engaged in a pervasive pattern of corruption that was in full flower when they came before him: Recall that Bracy and Collins were tried shortly before Maloney commenced the notorious trial of People v. Chow, in which he was paid to acquit each of the three defendants of murder. See Collins, 79 F. Supp. 2d at 903, 908 para.para. 12, 47. We are naturally reluctant to embark on a path that theoretically might lead to the undoing of every one of the thousands of cases over which Maloney presided. But if it was possible for Maloney, when not bribed, to provide the parties with a fair trial, why should it not be up to the State--which has far greater resources-- to supply us with adequate proof of his impartiality?

Our opinion in Harbin recognizes a category of trial errors that occupy a middle ground between the usual kinds of errors, which are subject to harmless-error review, and structural errors, which are conclusively presumed to be prejudicial and therefore result in automatic reversal. 250 F.3d at 543-44. These are serious errors, like jury tampering, which create an obvious and significant potential for prejudice, but which are, at the same time, difficult for a defendant to prove harmful. In such cases, prejudice is presumed but not conclusively--if the government can show that no harm resulted, then the conviction will stand. Id. at 544.

I submit that the corruption of the trial judge falls into this category of errors. Maloney's willingness to repudiate the oath of impartiality by repeatedly accepting bribes calls into question his ability to be fair in any case. See ante at 8. If he was inclined to help the State when not bribed-- whether to camouflage his corruption or to promote future bribes--the potential prejudice to a defendant who did not bribe him is obvious. Yet as this case makes altogether clear, proving the manifestation of that bias is extremely difficult. To assign the burden of proof to the petitioners may therefore be unrealistic and improper. Maloney was the

State's representative. See ante at 8. His bribe-taking was wholly beyond the petitioners' knowledge and control. If the State, in the face of evidence establishing that Maloney's corruption knew no bounds, wishes to defend the validity of the convictions over which he presided, then the burden arguably should fall upon it to affirmatively establish that Maloney was a fair and impartial judge when not bribed.

If the burden of proof is to be assigned to the petitioners, as Judges Evans and Posner both assume that it should be, then the limits of the proof available to them must be recognized. When the panel heard oral arguments in this case following the remand, I asked the State's counsel how Bracy and Collins might successfully prove that Maloney was biased. The State's counsel conceded that such a showing was all but impossible to make, absent an admission from Maloney himself or a pattern of courtroom conduct so obviously askew as to make his bias plain. The reason for the difficulty is obvious. Without a direct glimpse into Maloney's mind, we are left to look for indirect and incomplete clues as to Maloney's motives.

Proceeding from the premise that a judge's bias may be shown indirectly, ante at 8-9, Judge Evans locates some facts which raise the possibility that Maloney engaged in compensatory, camouflaging bias in this case: Maloney's appointment of McDonnell, a two-time felon and "outfit" lawyer, to represent Bracy; his citation of the convictions of Bracy and Collins (along with those of Hawkins and Fields) at his own sentencing as purported proof that he was an honest judge; and Maloney's unsuccessful effort to secure an affidavit from McDonnell asserting that it was Bracy, not Maloney, who chose McDonnell. Ante at 12-14. Collectively, these facts suggest that Maloney may have been looking at the Bracy-Collins prosecution as an opportunity to hide his bribe-taking, if not to cultivate additional bribes. Although Judge Evans detects no sign that such a compensatory bias was at work during the guilt/innocence phase of the trial, several circumstances suggest to him that Maloney may indeed have abandoned his "solemn responsibility" to assure the fairness of the penalty phase. Ante at 16. These include the summary denials of Bracy's motion to exclude evidence regarding the Arizona murders, Collins' alternative motion for a severance, and Bracy's alternative motion for a continuance; Maloney's efforts to actively discourage McDonnell from making a closing argument at the penalty hearing; and his failure to stop McDonnell (even in the face of the State's objections) from engaging in a tirade against the death penalty, a tirade

which invited the prosecution to make an argument that might have constituted reversible error had the defense not invited it. Ante at 16-22.

By contrast, Judge Posner's analysis proceeds from the premise that a judge's compensatory bias must be established directly, rather than inferentially. See ante at 27-28. He postulates that a case-specific bias could be shown in the same manner that it was in Cartalino, 122 F.3d at 10, where there was evidence that the judge had agreed to acquit one defendant and to do what he could to secure the conviction of the complaining co-defendant. Ante at 27. Or the trial record might reflect a pattern of rulings so blatantly slanted in favor of the State that it cannot be explained by any theory other than compensatory bias. Ante at 27. Alternatively, the petitioners might prove, through the corrupt judge's own testimony or through unspecified other evidence, that the judge had resolved to secure the convictions of all defendants who did not bribe him. Ante at 27-28. There is no such evidence here; and for Judge Posner, that ends our inquiry. That Maloney engaged in a pattern of bribe-taking does not alone, in his view, permit the inference that he ever engaged in compensatory bias. Ante at 27. Nor does proof that he harbored such bias in some cases permit the inference that he indulged such bias in this case. Id. In the end, Judge Posner concludes, all that the court can point to is the appearance of bias, and that appearance, as this court held in Del Vecchio v. Illinois Dep't of Corrections, 31 F.3d 1363 (7th Cir. 1994) (en banc), cert. denied, 514 U.S. 1037, 115 S. Ct. 1404 (1995), does not alone permit us to invalidate the petitioners' convictions. Ante at 34-35.

In my view, Judge Evans and Judge Posner are both right--in part. Ultimately, however, both of my colleagues attempt to cabin the effects of Maloney's wrongdoing in ways that are inconsistent with the nature and extent of his corruption and the signs of compensatory bias that the evidence supplies us.

Judge Evans' analysis displays a pragmatic appreciation for the nature of Maloney's wrongdoing. Although the point may seem obvious, one cannot conduct a proper search for compensatory bias without having in mind the basic nature of Maloney's criminal conduct. Maloney did not simply experience a momentary ethical lapse, or commit a crime unrelated to the job of judging. He used his position as a judge to reap (apparently) hundreds of thousands of dollars in bribes. Among the uncomfortably large group of judges convicted of bribe-taking in Cook County, he holds the distinction of being the

only one in the United States proven to have accepted bribes in murder cases. See Retired Judge Sentenced, National Law Journal, Aug. 1, 1994, at A8. The utter contempt that his pattern of crimes shows for the duties of his office, and in particular for the concept of judicial impartiality, wholly eliminates any presumption that he was a fair and decent judge when not pocketing money. See Bracy, 520 U.S. at 909, 117 S. Ct. at 1799. This in turn deprives the State of the benefit of the doubt with respect to evidence that raises questions about the propriety of Judge Maloney's actions in trying Bracy and Collins. So, as we consider what the record tells us about Maloney's mindset, we cannot resort to any tie-breaking presumption of impartiality in the face of evidence that is ambiguous or permits conflicting inferences about Maloney's motives.

By contrast, Judge Posner's analysis treats a judge's corruption as but a variant of stock ownership: So long as a judge did not acquire a concrete interest in the acquittal or conviction of the defendant by pocketing a bribe, there is no reason to think that his judgment was tainted. Instead, the petitioners must supply us with a reason to doubt the judge's impartiality. E.g., Cartalino, 122 F.3d at 10. Actually, Judge Maloney's pattern of bribes gives us a compelling reason to doubt his ability to be a fair, competent judge even in cases where no money changed hands. A judge cannot repudiate his oath of office any more completely than by accepting a bribe; fixing a case is the antithesis of judging. The notion that even a corrupt judge will give the parties a fair trial--unless the proof affirmatively shows otherwise-- necessarily hinges upon some sort of presumption of impartiality. In resorting to that aid, however, Judge Posner, who finds so many other points resolved by the Supreme Court's opinion in this case, overlooks one about which the Court could not have been more clear: The presumption of impartiality that normally attaches to a judge's conduct has been "soundly rebutted" in this case by the facts underlying Maloney's conviction. 520 U.S. at 909, 117 S. Ct. at 1793. We no longer have that crutch to lean upon.

With the presumption of impartiality having been removed from the case, Judge Evans is correct to recognize that Maloney's bias may be established indirectly. See ante at 8-9. The evidence available to Bracy and Collins simply does not afford them or us a glimpse into Maloney's mind. Maloney will not admit to his bribe-taking, let alone discuss what his motives were when he was not bribed. If there are others with whom he may have discussed his mindset, they are either

unknown or unwilling to reveal what they know. So we must look for less direct clues as to the presence or absence of bias elsewhere in the evidence.

By insisting upon direct proof of bias, Judge Posner would deny relief whenever the parties lack an unobstructed view into the corrupt judge's mind--even if the evidence otherwise suggests that bias may, in fact, have been present. The proof of bias that he demands is proof that in virtually all cases must come from the corrupt judge himself. The judge must either (1) confess to the bias under oath, (2) admit the bias at some point to a co-conspirator, who later proves willing to repeat the admission under oath,/1 or (3) render a pattern of rulings so blatantly favoring the prosecution that they cannot be explained by any hypothesis other than bias. Each of these direct forms of proof is unavailable here: Maloney will not admit to having taken a single bribe, let alone to any form of bias; his former partners in crime have either invoked the Fifth Amendment or pleaded ignorance of his motives; and although his rulings consistently favored the State, as Judge Posner himself points out, ante at 34, they are not so blatantly suspect as to bespeak bias in and of themselves. (The sole alternative means of establishing bias that Judge Posner cites--a Cartalino-like scenario in which one defendant bribes the judge both to acquit him and to convict his co-defendant--obviously will not be available in a case like this one, where no money has changed hands.) But the lack of the kind of proof that Judge Posner envisions by no means rules out the possibility that the corrupt judge was, in fact, indulging in compensatory bias. All that the judge need do to avoid creating the kind of record that Judge Posner envisions is to keep his mouth shut about his compensatory bias and to refrain from making bizarre rulings. Insistence upon direct proof would consequently foreclose relief in cases involving corrupt but careful judges who are unwilling to expose their own compensatory bias.

I therefore agree with Judge Evans that the search for proof of compensatory bias must include indirect, as well as direct, signs of such bias, and that the record in this case supplies us with adequate signs that such bias was at work during the capital phase of Bracy's and Collins' trial. His analysis appropriately recognizes that a corrupt judge may subvert the trial process not simply by offering affirmative assistance to one party or the other, but also by failing to preserve the balance between the litigants and to ensure that a criminal defendant's rights are not neglected. See ante at

15-22. He is also correct to point out that the lack of a neutral arbiter arguably poses the greatest threat to the defendant's rights at the penalty phase of a capital trial, when the inquiry turns from the relatively straightforward determination of whether or not the defendant committed a crime to the question of whether or not he should die for that crime, a profound determination that turns on a largely subjective assessment of his entire criminal history, the psycho-social context of that history, the effects his crimes have had upon others, his prospects for reform and redemption, and so forth. See id. at 15-16. Against that backdrop, I believe Judge Evans rightly concludes, as did Judge Hart, that bias may be inferred from Judge Maloney's handling of the penalty phase of the Bracy-Collins trial. The flaws that Judge Evans seizes upon might not, in the abstract, seem like compelling enough proof to overcome the presumption of impartiality that normally attaches to a judge's rulings. But, again, that presumption is gone from this case. Our analysis must therefore proceed without attributing to Maloney any of the goodwill we would assign to the presumptively honest judge. The rulings and remarks that Judge Evans cites--in particular, Maloney's decisions to allow testimony regarding the Arizona murders into evidence, to deny a severance, and to deny a continuance, all without any articulated reasons, and his (unsuccessful) effort to discourage Bracy's lawyer from making a closing argument (when the jury's choice of penalty was between life and death!)--reasonably suggest that Maloney had abandoned his role as a neutral arbiter. If there are other facts that tilt the scales in the opposite direction--which affirmatively show, in other words, that Maloney was attempting to give the defense a fair penalty hearing--neither the State nor Judge Posner has cited them. In that context, I agree with Judge Evans that Judge Hart did not clearly err in finding that the penalty phase of the trial reflects compensatory bias on Maloney's part.

But I think that Judge Posner is right to question the plausibility of inferring that Maloney was biased as to the capital phase of the trial but not the guilt/innocence phase. As Judge Posner points out, Judge Maloney's rulings at the guilt phase of the trial consistently favored the prosecution, just as they did at the penalty phase. Ante at 34. I would add that a number of the rulings at the guilt phase had significant effects on the course of the trial. Not the least among these rulings was Maloney's decision (which he later sought to pin on Bracy, see ante at 13) to appoint McDonnell as Bracy's lawyer. Few decisions are more important than the choice of one's trial counsel. However poor an attorney's

skills, level of preparedness, and tactical decisions appear to be in retrospect, the range of representation deemed constitutionally adequate is wide. Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065 (1984). Even wholly inexcusable lapses by an attorney may be deemed harmless once his client has been convicted. See id. at 687, 104 S. Ct. at 2064 (to succeed on ineffectiveness claim, defendant must show not only that his counsel's performance was deficient, but that the attorney's errors prejudiced the defense). With two felony convictions to his name, an evident ethical impairment, and connections to organized crime, McDonnell was hardly an obvious candidate for a court appointment to represent someone charged with a capital offense--unless, perhaps, the appointing judge was uninterested (or worse, malevolently interested) in the quality of representation that the defendant received. McDonnell's announcement, just three weeks after he was appointed, that he was ready for trial further raises an already-elevated eyebrow. McDonnell's failure at the capital phase of the trial to present a scintilla of mitigating evidence that would warrant imprisonment rather than execution, and his failure to make any argument against imposition of the death penalty other than a generalized attack upon capital punishment, see Hall v. Washington, 106 F.3d 742, 750 (7th Cir.), cert. denied, 522 U.S. 907, 118 S. Ct. 264 (1997), raise obvious doubts about his overall effectiveness and--given his shady credentials--Maloney's decision to appoint him in the first place. The rationale for confining the finding of bias to the capital phase of the trial therefore remains elusive. The fact that a defendant's life is at stake in a capital proceeding may well heighten the judge's duty to maintain the balance between the parties and magnify the harm resulting from his failure to do so; however, the judge enjoys no less discretion in a non-capital (or for that matter, a non-criminal) proceeding and has no less of an ability to exercise that discretion in such a way as to steer the outcome to a particular result./2

   Indeed, the extent of a judge's discretion, and the cloak that discretion provides for a judge's bias, are matters that Judges Posner and Evans both underestimate. Neither finds a reason to question any of Judge Maloney's rulings at the guilt/innocence phase of the trial, and although Judge Evans questions a number of Maloney's rulings at the penalty phase, Judge Posner finds even those rulings perfectly defensible. But discretionary rulings are an unreliable barometer for the bias of the trial judge. Such rulings can rarely be labeled "correct" or "incorrect" in the

sense that there is only one proper ruling in a particular set of circumstances. The very concept of discretion assumes that any number of answers to a question are possible, and that the answer is best left to the assessment of the judge. Abuse of discretion typically is found not when the judge fails to render the "right" ruling, but when he or she applies the wrong legal standard, ignores crucial facts, or rests his ruling on irrelevant or inappropriate factors. E.g., Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 896 (7th Cir. 2001); United States v. Tingle, 183 F.3d 719, 728 (7th Cir.), cert. denied, 528 U.S. 1048, 120 S. Ct. 584 (1999); United States v. McDowell, 117 F.3d 974, 978 n.4 (7th Cir. 1997). Indeed, so long as they are applying the right law and considering the relevant factors, two judges may confront the same problem and render different rulings without either one of them having abused their discretion or committed clear error. United States v. Williams, 81 F.3d 1434, 1437 (7th Cir. 1996), cert. denied, 522 U.S. 1006, 118 S. Ct. 582 (1997), and cert. denied sub nom. Bates v. United States, 522 U.S. 1062, 118 S. Ct. 723 (1998). "That possibility is implicit in the concept of a discretionary judgment." Id., citing Rice v. Nova Biomedical Corp., 38 F.3d 909, 918 (7th Cir. 1994), cert. denied, 514 U.S. 1111, 115 S. Ct. 1964 (1995). Rulings that on their face are justifiable therefore tell us little about whether compensatory bias was at work in the judge's decision-making. Likewise, a judge may abuse his discretion, may even commit a "veritable avalanche of errors," United States v. Santos, 201 F.3d 953, 965 (7th Cir. 2000), without there being reason to suspect that bias was at work. Judges make mistakes, period. Bias, when it is at work, will not necessarily announce itself in either the judge's ruling or his rationale. See Vasquez v. Hillery, 474 U.S. 254, 263, 106 S. Ct. 617, 623 (1986) ("when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review . . . .") (emphasis supplied). A corrupt judge who wishes to stack the deck against a party may cite plausible reasons for his rulings and yet make his decisions for illicit purposes; it is easy to imagine that a judge with Maloney's experience would not find it difficult to cloak his bias, if any, in this way. That Maloney's rulings at either phase of the trial therefore seem appropriate--that is, within the range of discretion--tells us little about whether those rulings were infected by compensatory bias. The only objective observation we can make with certainty is that they consistently favored the State.

The inherent difficulty of piercing a judge's exercise of discretion is what has led me to

conclude that the temptation-to-bias framework is a superior means of analyzing the petitioners' claim. Cases such as Tumey v. Ohio, 273 U.S. 510, 532, 47 S. Ct. 437, 444 (1927), In re Murchison, 349 U.S. 133, 136-37, 75 S. Ct. 623, 625-26 (1955), and Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-25, 106 S. Ct. 1580, 1585-87 (1986), recognize that circumstances which give the judge a stake in the outcome of a cause present her with a temptation to favor one party or the other. These cases disavow any inquiry into whether the judge in fact yielded to the temptation. To the contrary, in each case, the Supreme Court acknowledged the possibility that the judge in question was not, in fact, biased. Id. at 825, 106 S. Ct. at 1587; Murchison, 349 U.S. at 136, 75 S. Ct. at 625; see also id. at 140, 75 S. Ct. at 627 (Reed, J., dissenting); Tumey, 273 U.S. at 532, 47 S. Ct. at 444. Instead, the Court found the mere possibility that the judge might have yielded to the temptation sufficient to vacate the judgment:

[T]he requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

Ibid. (emphasis supplied); see also Aetna Life, 475 U.S. at 825, 106 S. Ct. at 1587 ("The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'") (quoting Murchison, 349 U.S. at 136, 75 S. Ct. at 625); Murchison, 349 U.S. at 136, 75 S. Ct. at 625 ("our system of law has always endeavored to prevent even the probability of unfairness"). Implicit in the Court's rationale lies the recognition that we cannot always know, in hindsight, whether a judge confronted with such an incentive was or was not impartial. Vasquez, 474 U.S. at 263, 106 S. Ct. at 623 (citing Tumey, 273 U.S. at 535, 47 S. Ct. at 445). Given the inability to rule out bias in fact, the possibility of such bias lingers, undermining confidence in the judgment. Ibid.; see also Murchison, 349 U.S. at 136, 75 S. Ct. at 625 ("to perform its high function in the best way, 'justice must satisfy the appearance of justice'") (quoting Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954)). I submit that this case, like Tumey, Murchison, and Aetna

Life, presents a temptation to bias, and whether or not Judge Maloney was actually motivated by that bias cannot really be known. See Vasquez, 474 U.S. at 263, 106 S. Ct. at 623. True, the case does not involve a case-specific, purely financial bias, as Judge Posner points out. Ante at 27. Neither, I would add, does it involve an honest judge making a good-faith effort to abide by his oath of office. Maloney's pattern of bribe-taking, coupled with the possible temptation to favor the State in cases where no bribe was tendered--in order to conceal his corruption and encourage defendants to bribe him--promotes lingering doubts as to the validity of the judgments over which he presided. The discomfort is evident in the divided nature of the court's opinion today.

Of course, Judge Posner remains skeptical that Maloney had any incentive to lean in favor of the State. See ante at 25-26. Again he suggests that a corrupt judge might be just as likely to hide his bribe-taking by cultivating a pro-defendant reputation, so that an acquittal or other ruling paid for by the defense looks less suspect. Id. We know, however, that Maloney did not adopt a consistent defense leaning in order to camouflage his corruption--Maloney long had a reputation for being a tough, State-oriented judge. Yet, we also know that Maloney was quite concerned about exposure, and was willing to take even precipitous steps to hide his bribe-taking. Thus, he returned the $10,000 bribe he had been given to acquit Hawkins and Fields and then convicted them; and in Titone, he went so far as to keep the $10,000 bribe but convicted the defendant anyway. Judge Posner insists that "[n]either case had anything to do with compensatory bias," ante at 30, but this ignores the findings that the state courts rendered in vacating the convictions in those cases. The Illinois Supreme Court found that Hawkins and Fields were entitled to a new trial because Maloney had been motivated to convict them in order to deflect suspicion from himself. People v. Hawkins, 690 N.E.2d 999, 1004 (Ill. 1998) ("[Maloney] wanted to insure that he did not lose his judicial post and salary as a result of criminal indictment, and therefore was motivated to return a verdict that would not spark the suspicions of authorities"). Similarly, in ordering a new trial for Titone, Judge Strayhorn implicitly but unmistakably acknowledged that Maloney had an incentive to convict Titone in order to camouflage his corruption. R. 239, People v. Titone, No. 83 C 127, Post-conviction Tr. at 12 ("Dino Titone did not receive the kind of fair, impartial trial before a fair, unbiased, impartial judge that his constitutional rights as a citizen required."). True, neither court found that Maloney yielded to

that incentive, for the direct proof necessary to establish actual, compensatory bias was lacking there just as it is here. Theoretically, it was possible that Maloney gave Hawkins, Fields, and Titone fair trials notwithstanding the bribes that had been tendered. But the incentive to convict them in order to serve Maloney's interest in avoiding detection was present, and the possibility that he gave in to that incentive was real. It is also true that in this case, unlike Hawkins and Titone, there was no bribe tendered that might have attracted the eye of government investigators. Yet William Swano's testimony suggests that Maloney practiced compensatory bias precisely in cases like this one, where no bribe was tendered, in order to cultivate bribes from the defense bar. Recall that Swano, who had bribed Maloney in previous cases, withheld a bribe in the Davis case because he thought he had a strong case on the merits. To Swano's surprise, Maloney convicted his client. Swano interpreted the conviction as a message from Maloney that payment was required in order to obtain an acquittal in his courtroom. Maloney's bagman, Robert McGee, appears to have confirmed the accuracy of that construction when he and Swano met to discuss a bribe in a subsequent case. McGee told Swano that Maloney was willing to discuss a bribe in view of the fact that he had "screwed" Swano in the Davis case. R. 241, United States v. Maloney & McGee, No. 91 CR 477, Trial Tr. at 2568. Collectively, this evidence demonstrates that Judge Maloney was faced with a temptation to favor the State in some cases in order to both promote and hide his bribe-taking in others, and that he yielded to that temptation on more than one occasion. Particularly in view of the evidence that Judge Evans has cited suggesting that Maloney abandoned neutrality in this particular case, there is every reason to think that Maloney confronted the same temptation here. That is more than enough, under Tumey, Murchison, and Aetna Life, to entitle Bracy and Collins to relief.

Whether the Supreme Court will adopt or reject the temptation-to-bias framework for judicial-corruption cases remains to be seen. Judge Posner may be a superior reader of tea leaves, but I can find no actual holding in the Court's opinion in this case to the effect that Tumey and its progeny are inapposite and that actual bias invariably must be shown. Yes, the Court granted the petitioners the right to discovery so that they might establish actual bias, but in confining the scope of the case to discovery, the Court declined to consider whether proof of actual bias is the only means to relief in a case of judicial corruption. See Bracy v. Gramley, 519 U.S. 1074, 117 S. Ct. 726 (1997) (granting

certiorari in part).

For all of these reasons, I believe that we must vacate the petitioners' convictions as well as their sentences. The temptation for Maloney to favor the State as a means of hiding and promoting his corruption was present in this case as we know it was in other cases, and there are signs-- including the appointment of a felon to represent Bracy, the refusal to continue the penalty hearing notwithstanding the belated disclosure that the State intended to introduce additional murders as an aggravating factor, and the effort to discourage Bracy's counsel from making a closing argument at the penalty hearing--that suggest Maloney may well have yielded to the temptation. More direct proof of bias is simply unavailable without the cooperation of Maloney or his co-conspirators, none of whom has proven willing or able to provide it.

Although some of my colleagues fear that we will be compounding the wrong that Maloney committed by granting a new trial to petitioners who did not bribe him, I submit that the opposite is true. The right to trial before an impartial judge means nothing if it is not a right that we are willing to enforce. It is hard to see why a new trial is warranted when an honest judge is faced with a financial temptation to favor one party or the other--although it is a temptation he might in fact have resisted (see Tumey, Murchison, and Aetna Life)--but not when a corrupt judge is presented with a penal as well as a financial incentive to favor a party. It is not enough for us to decry Maloney's actions as contemptible, appalling, and depraved. Those words ring hollow when, at the same time we utter them, we deem this contemptible, appalling, and depraved man a constitutionally adequate adjudicator. Due process means something, and in my view it means something more than trial and the infliction of the ultimate punishment before the likes of a judicial racketeer.

FOOTNOTES

/1 This is the only way that I can see to establish a conspiracy to practice compensatory bias in one or more cases without the corrupt judge's own testimony. See ante at 27.

/2 I would note that Judge Maloney's handling of closing arguments at the guilt/innocence phase of the trial, as well as the capital phase, arguably supports an inference of compensatory bias at work. As the State's first closing argument built to a conclusion asking the jury to convict the defendants, the prosecutor turned his attention from Collins (whom he had called "a[s] vicious

and cold and cal[c]ulating a killer as the good Lord ever created," R. 23-5 at 1300) and Bracy (just "as bad," id. at 1301) to their attorneys. After noting that it was his duty and that of his colleague to represent the State, the prosecutor continued:

It is the responsibility of Mr. Frazin (Collins' counsel) to represent this killer, and it is the responsibility of Mr. McDonnell (Bracy's attorney) to represent this killer.

Id. at 1335. An objection was overruled. Id. At that point, the prosecutor felt free to commence an attack upon the defense counsels' tactics, encouraging the jury to "think about the facts that these two lawyers get up here and mimic and mock and demean you," id. at 1338, and suggesting that either McDonnell or Frazin--he wasn't sure which--"is trying to hoodwink you," id. at 1354.

   Having been given such free rein at the guilt phase of the trial, it comes as little surprise that during closing arguments at the penalty phase, the prosecution argued not only that McDonnell's criticism of capital punishment was "a slap in every veteran's face," R. 23-6 at 1646, as Judge Evans has pointed out, but also that Bracy and Collins themselves would think a sentence of death fair and appropriate:

I will tell you one thing, ladies and gentlemen of this jury, if you come back with a decision that the death penalty should be imposed, I guarantee you that Roger Collins and William Bracey [sic] won't feel it is an unfair decision.

Id. at 1654. "Objection to that," complained McDonnell. Id. "I think that is improper," echoed Frazin. Id. "Objection overruled," was Judge Maloney's response. Id.